No. 82-269

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

THE MISSOULIAN, a division of
Lee Enterprises, Inc.,

        Plaintiff and Appellant,

  -vs-

BOARD OF REGENTS OF HIGHER EDUCATION
and JOHN RICHARDSON, COMMISSIONER OF
HIGHER EDUCATION,

        Defendants and Respondents.

---

APPEAL FROM:  District Court of the First Judicial District,
               In and for the County of Lewis & Clark,
               The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Miloragovich, Dale & Dye; Harold V. Dye argued,
        Missoula, Montana

    For Respondents:

        G. Steven Brown argued, Helena, Montana
        LeRoy Schramm, Montana University System, Helena,
        Montana

    For Amicus Curiae:

        Jayne Mitchell for Dept. of Administration,
        Helena, Montana

---

                Submitted:   October 31, 1983

                Decided:   January 23, 1984

Filed:

                 *Ethel M. Harrison*

                      Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff Missoulian appeals from summary judgment granted by the First Judicial District Court, Lewis and Clark County. The action was brought by the Missoulian under the Montana Constitution and Open Meeting Act, challenging closure by the Board of Regents (Board) of a job performance evaluation meeting concerning presidents of the six university system units. The District Court granted summary judgment, upholding the legality of the meeting closure. The Missoulian appeals and the State Department of Administration appears as amicus curiae. We affirm the judgment of the District Court.

The issues are:

1. Whether job performance evaluations of university presidents, which elicit candid and subjective comments from Board members, anonymous interviewees, and the presidents themselves, are matters of individual privacy protected by the Montana Constitution or whether the privacy clause protects only matters of family or health not affecting job performance?

2. Whether the university presidents' privacy interests in job performance evaluations clearly exceed the public's constitutional and statutory right to know, particularly in light of the Board's contention that confidential evaluations are in the public interest?

3. Whether closure of job performance evaluation meetings is necessary to protect the presidents' privacy interests or whether alternative methods exist for protecting individual privacy in evaluation meetings?

On January 7, 1980, the Board adopted procedures for evaluation of university presidents. The Board and the Commissioner of Higher Education (Commissioner) are responsible for hiring, firing and supervising the

presidents.  The Performance Evaluation Policy provided for two levels of evaluation, an annual review and a more thorough periodic evaluation, which was to occur every three years.  Annual review involved a president preparing a statement of goals and objectives for his institution and an informal and confidential discussion of performance between the president and the Board.  In 1980, Presidents William Tietz (Montana State University), Fred DeMoney (Montana College of Mineral Science and Technology), James Erickson (Northern Montana College), and Robert Thomas (Western Montana College) were evaluated under annual review procedures.

Periodic evaluation was, by contrast, more formal and structured.  A president undergoing periodic evaluation was to prepare a thorough evaluation of his own performance and of the performance of his administration in the areas of academic administration and planning, fiscal management, problem solving and decision making, personnel management and appointments and external relations.  The Commissioner was to interview persons representative of faculty, staff, students, administration, alumni, community leaders and elected officials on various aspects of the president's performance. The Board would then discuss in confidence with the president the self-evaluation and results of the Commissioner's interviews.  In 1980, Presidents Richard Bowers (University of Montana) and John Van de Wetering (Eastern Montana College) were evaluated under periodic review procedures.

Prior to the May 3, 1980 meeting, the Commissioner, John Richardson (Richardson) conducted 74 interviews concerning the job performance of Presidents Bowers and Van de Wetering. The Commissioner gave each interviewee an assurance of confidentiality at the beginning of the interview and in the letter requesting the interview.  The interviews covered the

issues listed in the Board's job performance evaluation policy. In conducting his interviews, Richardson used what he termed a "directed interview format." Richardson would ask each interviewee a series of open-ended questions concerning the president's performance. Interviewees were asked for their evaluations of the president's strengths and weaknesses. Using the topic areas of his interview sheet as an outline, Richardson then prepared a summary of the results of the interviews broken down by category of interviewee. In presenting his summary at the May 3 meeting, Richardson took care that particular interviewees could not be identified from his remarks.

The Board's Performance Evaluation Policy specifies that "[t]he principle of confidentiality will be observed throughout the review process" and that the principle will "apply to written documents and to discussions among all those who participate." The policy further specifies that the evaluations will be conducted in "executive session."

At the Board's April 21, 1980 meeting, the Missoulian formally requested to attend the performance evaluation of UM President Richard Bowers and to review the evaluation documents considered by the Board. The Missoulian's request was based on the contention that the meeting involved "the carrying out of the public's business in public education and therefore the public should be apprised." The request was denied on grounds that the demands of individual privacy clearly exceeded the merits of public disclosure. In its brief, the Missoulian states that it wished access to this information "simply because of its news value to its readership." Later, Missoulian changed its request to include access to all presidential evaluations. An attempt at a compromise solution failed.

4

At the May 3, 1980 meeting, the Missoulian requested access to each evaluation session. That request was denied. The Missoulian's reporter, Mea Andrews, asked each president and the Commissioner if they would waive their privacy rights; each refused. The evaluations were conducted with only the Board, the Commissioner and the individual president present. No handwritten or recorded minutes were kept.

After the meeting, a statement of goals prepared by each president was released to reporters. Also released was a list of the categories of interviewees and questions asked in the interviews by the Commissioner. Chairman Ted James stated after the meeting that most of the annual review sessions could have been open and some of the periodic review sessions could have been open.

The Board notes that during consideration of the evaluation procedures prior to their adoption, a copy of the proposed procedures was circulated to the members of the press, including the Missoulian. No objection to the procedures was made by the Missoulian. Further, an editorial written by publisher Tom Brown had appeared in the Missoulian supporting the evaluation procedure because it removed the evaluation from the political process and because every employee, whether he be "a typist at a local business or the president of the university, deserves a fair, honest and thorough evaluation of performance."

Four of the Presidents, Erickson, Tietz, Thomas, and DeMoney, were evaluated under the less extensive annual review procedure. These evaluations were generally short, lasting from 15 to 45 minutes. Each President subjected to annual review submitted a list of objectives and goals, but these were not discussed at the meeting. Each of these presidents had an expectation that the process would be confidential.

Presidents Bowers and Van de Wetering were evaluated under the three-year periodic review procedures. Their evaluations lasted approximately an hour to an hour and a half. Each prepared and submitted in advance a written self-evaluation.

Bowers' self-evaluation was an analysis of his performance as President and an evaluation of his administration, staff and faculty. Bowers prepared his self-evaluation with an expectation of confidentiality. He would have written the self-evaluation differently if it was to be a public document. Bower's self-evaluation contained statements and criticisms which if made public would have damaged his ability to function as UM president. These statements would not have been made if they were to be released to the public. If Bowers had deleted or modified these statements, he believes his self-evaluation would have been an incomplete statement and would not have been an accurate self-evaluation of his "total performance as president."

Van de Wetering marked his self-evaluation "CONFIDENTIAL" and prepared it believing it would be read only by the Commissioner and the Regents. In his preface, he stated he was attempting to "let it all hang out." He stated he would not have been so frank if it were meant to be made public. Van de Wetering's self-evaluation also contained potentially damaging comments which would be made only in confidence. He believes he could not have survived as EMC president and that his governing ability and his ability to work with various individuals would have been adversely affected had the self-evaluation been publicly released.

The Commissioner presented to the Board an oral summary of the comments gathered during his confidential campus and community interviews. These comments consisted of subjective

evaluations of the presidents' strengths, weaknesses, and effectiveness in a number of subject areas.

Following this presentation by the Commissioner, the sessions consisted of discussions of various areas of performance or problem areas and discussion of rumors and accusations. During the meetings, no policy decisions or directives were made, nor were the merits of any particular policies debated. The record shows that policy matters were involved in the evaluations only insofar as they related to the individual president's performance or the effects of a given policy on his administration, its image and ability to govern effectively. The discussions centered on personal relationships and personalities, subjective evaluation of various personnel or faculty and the presidents' management style, methodology and decision-making approach. Other areas of discussion included family, health, personal plans, relationships with Board members and faculty-administration relations. The discussion included potentially defamatory remarks regarding specific persons. Much of the material discussed was of such character that it would not be discussed in public.

Chairman James and Commissioner Richardson felt the effectiveness of the evaluations depended upon their confidentiality. James indicated that if the evaluations had to be conducted in public, they would probably be abandoned. Richardson stated that the Boards' evaluations were of "immeasurable assistance" to him and the Board. He believes the procedure helps to head off potential problems before they damage a university or college. He would recommend abolishing the evaluation procedure if it was open to the public. Public disclosure would, in his opinion, inhibit candid evaluations by faculty and staff, discourage candid

7

presidential self-evaluations, and damage the presidents' ability to govern.

All six presidents use confidential evaluations for their staffs. Each considers them an essential tool of effective management, without which governing ability would be adversely affected. One president went so far as to say that without such a tool he would leave the profession.

Bowers entered the presidential performance evaluation process with an expectation of confidentiality. During his years of experience in higher education, Bowers had always been evaluated in private and had no reason to expect the Board's evaluation would be anything but confidential.

Bowers believes the discussion of his staff's performance was a necessary part of the evaluation of his performance and that such discussions must be held in private. Bowers also believes that a thorough performance evaluation must include a discussion of decision-making methodology, personal traits and a person's ability or inability to make decisions. These discussions could affect a person's ability to obtain future employment if held in public.

President Van de Wetering believes a frank self-evaluation is necessary in order to determine if the president is aware of his own problems and whether the Board perceives them as problems.

The Board notes that the Missoulian and other private enterprises recognize the value of and use confidential personnel evaluations because they aid in improvement of performance and allow employer and employee to openly express opinions, offer suggestions and communicate.

The Missoulian brought this action under the "right to know" provisions of the Montana Constitution and the Open Meeting Act against the Board and Commissioner Richardson,

challenging the closure of the May 3, 1980 job performance evaluation meeting. Shortly after the action was filed, the Board moved for summary judgment. The matter was extensively briefed and argued and the motion was denied by the District Court on November 10, 1980.

Later, the Missoulian deposed the presidents, the Commissioner and the chairman. The Board deposed the Missoulian's publisher, Tom Brown, Managing Editor Rod Deckert and reporter Mea Andrews. After completion of discovery, both parties moved for summary judgment. In addition to the depositions, the record before the District Court consisted of two affidavits by Ted James, one affidavit each by John Richardson, Rod Deckert and Mea Andrews and the Board's response to the Missoulian's Request for Production. On June 17, 1982, the District Court granted the Board's Motion for Summary Judgment, sustaining closure of the May 3, 1980 meeting.

The Missoulian appeals. The State Department of Administration has filed a brief as amicus curiae, because the decision in this case may have significant statewide impact on employee evaluation procedures, which the Department is responsible to develop.

I

The first issue is whether job performance evaluations of university presidents, which elicit candid and subjective comments from Board members, anonymous interviewees, and the presidents themselves, are matters of individual privacy protected by the Montana Constitution or whether the privacy clause protects only matters of family or health not affecting job performance.

The Missoulian argues that university presidents have no privacy interest in performance evaluations. It contends that presidents can have no reasonable expectation of privacy

9

except in the narrow areas of personal health and family which do not affect job performance. It argues that the presidents' job performance is a public matter which society is unwilling to recognize as private and that the interweaving of public business with the small amount of private matter discussed compels open evaluations. We disagree with the Missoulian's characterization of what was discussed and their contention that it is not private.

Article II, section 10 of the Montana Constitution establishes a fundamental right of privacy:

> "Right of Privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

We discussed the adoption and scope of the privacy clause in Montana Human Rights Division v. City of Billings (Mont. 1982), 649 P.2d 1283, 39 St.Rep. 1504. We noted that the Montana Constitution provides more privacy protection than the Federal Constitution. 649 P.2d at 1286, 39 St.Rep. at 1508. But the Constitutional Convention delegates appear to have left to the courts the task of defining the scope of the privacy right on a case-by-case basis. Gorman, Rights In Collision: The Individual Right of Privacy and the Public Right to Know, 39 Mont.L.Rev. 249, 266-67 (1978). The only apparent clue left by the delegates regarding privacy in personnel matters is the statement of delegate Dorothy Eck of the Bill of Rights Committee that the Committee considered "deliberations regarding personnel" private. Mont. Const. Convention, Verbatim Transcript, Vol. V, pp. 1670-71 (March 7, 1972). Her comment, however, is not sufficiently specific to resolve this issue.

This Court applies a two-part test to determine whether a person has a constitutionally protected privacy interest: whether the person involved had a subjective or actual expectation of privacy and whether society is willing to

10

recognize that expectation as reasonable. _Montana Human Rights Division_, 649 P.2d at 1287, 39 St.Rep. at 1509. We applied this test in _Montana Human Rights Division_ and found a privacy interest in personnel records of city employees and applicants for employment.

There, the Human Rights Commission (HRC) was investigating employees' complaints of discrimination by the City of Billings. During the investigation, HRC attempted to gain access to personnel files, employee evaluations, disciplinary records, test scores and application materials for complainants and certain other employees and applicants. The City refused to allow access without consent of the individual employees whose files were sought, because to do so might constitute an invasion of privacy. 649 P.2d at 1285, 39 St.Rep. at 1505. This Court was squarely faced with the issue of whether that information was protected by the Montana Constitution and, if so, under what circumstances that right could be infringed.

Applying the first part of the privacy test, we found that the city employees and applicants had an actual expectation of privacy. 649 P.2d at 1287, 39 St.Rep. at 1509.

Here, the Board's written evaluation policy stated that the self-evaluations would be confidential and the evaluation meetings would be conducted in "executive session." The anonymous interviewees who commented on the presidents' performance were promised confidentiality. It is undisputed that the six university presidents actually expected that the job performance evaluations would be private. Bowers and Van de Wetering submitted their self-evaluations expecting confidentiality. The first part of the privacy test is clearly satisfied.

11

The more difficult question is whether these actual expectations of privacy were reasonable. In Montana Human Rights Division, we stated that the "right of privacy turns on the reasonableness of the expectation, which may vary, even regarding the same information and the same recipient of that information." 649 P.2d at 1288, 39 St.Rep. at 1509. The Missoulian is correct that time, place and status are factors in the reasonableness determination. But the determination should include consideration of all relevant circumstances, including the nature of the information sought.

In assessing the reasonableness of public employees' privacy expectations in personnel matters in Montana Human Rights Division, we stated:

"Employment records would reasonably contain, among less sensitive information, references to family problems, health problems, past and present employers' criticism and observations, military records, scores from IQ tests and performance tests, prison records, drug or alcohol problems, and other matters, many of which most individuals would not willingly disclose publicly. Some testing and disclosure (e.g., past employment records, prison records, drug or alcohol use) is a necessary part of many applications for employment; other information may be compiled by present employers or may be submitted by an employee in explanation of absence from work or poor performance on the job. It is clear that there is frequently pressure upon an employee to communicate these matters to his employer in the privacy of his boss's office or on an application for employment or promotion. And while, as far as we know, respondents gave their employees no specific assurances of confidentiality, we believe that employees would reasonably expect such communication normally would be kept confidential. Therefore, we find that under the circumstances of this case, the information requested by the HRC is subject to the protection of Montana's constitutional right of privacy (§ 10)." 649 P.2d at 1287-88, 39 St.Rep. at 1509.

In fact, much of the discussion at the evaluation meetings involved matters within the categories listed in Montana Human Rights Division, as well as matters in other categories. The discussion included family and health problems, employer's criticisms, employees' criticisms of the

12

employer, interpersonal relationships, subjective viewpoints of the performance of the presidents and various subordinates, the ability of the presidents to work with the faculty, and other matters of a similarly sensitive nature. The self-evaluations of Bowers and Van de Wetering were also discussed.

The Missoulian contends that much of the discussion concerned matters of public record or public policy in which the presidents can have no privacy interest. However, we do not agree with the Missoulian's reading of the record. The record shows that matters of public interest were discussed only peripherally, insofar as they impacted job performance or interpersonal dynamics. The Board did not deliberate on policy matters. They inquired into only the effects of various policies upon the presidents' abilities to function.

The Missoulian further argues that because innocuous information or matters of public knowledge were discussed along with private matter, there was no privacy interest at stake. In Montana Human Rights Division, we recognized that the information sought by HRC contained harmless or generally known information, but that the information was nonetheless subject to constitutional protection:

> "While we are aware that much of the information contained in employment files and records is harmless or is already a matter of general knowledge, we are not persuaded that the records are entirely free of damaging information which the individuals involved would not wish and in fact did not expect to be disclosed." 649 P.2d at 1287, 39 St.Rep. at 1509.

Obviously, nearly all private matters contain some component of innocuous information or general knowledge. However, that component does not transform private matter into public.

The Missoulian contends that because public record information can be published without liability, Cox Broadcasting Corp. v. Cohn (1975), 420 U.S. 469, the information here which contains some public knowledge is not

13

protected by the privacy clause. But Cox Broadcasting holds only that where material is a part of the public record it may be published. It does not hold that any information must be released to the media. 420 U.S. at 495. Certainly, the media is free to obtain and publish within legal guidelines information from the public record. But the free press rights at stake in Cox Broadcasting are distinguishable from and should not be confused with the public's right to know.

The status of university presidents, the Missoulian argues, so diminishes their privacy rights that job performance evaluations are not protected by the privacy clause. The Missoulian argues that Montana Human Rights Division is distinguishable because university presidents are policy-making officials whose actions are of greater importance to the public than the employees in Montana Human Rights Division. We do not doubt that university presidents' privacy interests may be less in some circumstances than other public employees. However, mere status does not control the determination. University presidents do not waive their constitutional protections by taking office. We do not agree that the presidents' privacy interests are too weak to protect the information at stake here.

The Missoulian has failed to show any significant distinction in this case between the job performance evaluations of university presidents and other public employees. Indeed, the sensitive nature of the presidential function suggests that there is all the more reason to expect confidentiality in presidential evaluations. A university president depends to a large degree upon good relations and a strong image within the university community for the successful accomplishment of his job. A university president has good reason to expect that his unabashed views, his candid evaluations of himself and his staff, and his

14

perceptions of the faculty will remain private. This information was obtained by the Board through candid and subjective responses by the presidents, anonymous interviewees, and Board members after assurances of confidentiality. Neither policy decisions nor directives were discussed and they are not addressed here.

We emphasize that it is not only the presidents who had privacy interests at stake in these evaluation sessions. Numerous administrative staff, faculty members and other university employees were discussed. The matters discussed with regard to these employees was of a sensitive nature and would reasonably be expected to remain confidential. We must consider closure of the sessions in light of the privacy of these employees as well as that of the presidents.

In Trenton Times Corp. v. Board of Education (N.J.Super 1976), 351 A.2d 30, the court found that personnel records and evaluations of a school superintendent were private matters not subject to the public's right to know. The court stated:

> "Personnel records . . . include employees' performance ratings. The policy to keep performance ratings confidential has been adopted: first, to protect the right of privacy of the government employee; second, because the evaluations are subjective opinions of the performance of the employee that vary with the person giving the rating; third, public disclosure would impede receiving candid evaluations; and fourth, a supervisor could use the public nature of these ratings as a vindictive mechanism against employees he disliked. The lack of objective criteria, the potential for vindictiveness, the lack of an opportunity for the employee to rebut statements made in the rating, and a substantial potential for abuse leads to the conclusion that these ratings should be kept confidential." 351 A.2d at 33.

The reasons behind a policy of confidential evaluation and the dangers of public disclosure recognized by the New Jersey court are applicable here.

We note that many organizations, including the Missoulian, recognize the reasonableness and benefit of

confidential personnel evaluations. Indeed, the Missoulian's editorial supported the confidentiality of the evaluations. The record shows that confidential evaluations are used by other states. We conclude that the university presidents have a reasonable expectation of privacy in job performance evaluations.

The Missoulian relies upon a number of cases for the proposition that no privacy interest attaches to job performance evaluations of university presidents. However, those cases do not address the scope of the right of privacy. The cases generally address only the scope of the open meeting law in a particular state without any countervailing privacy right at stake. See Ridenour v. Board of Education (Mich.App. 1981), 314 N.W.2d 760, 762-64; Polillo v. Deane (N.J. 1977), 379 A.2d 211, 218.

We hold that the university presidents' job performance evaluations were matters of individual privacy protected by Article II, section 10 of the Montana Constitution.

II

The second issue is whether the university presidents' privacy interests in job performance evaluations clearly exceed the public's constitutional and statutory right to know, particularly in light of the Board's contention that confidential evaluations are in the public interest.

The Missoulian argues that the right of privacy is generally subordinate to the public right to know. It contends this is the scheme intended by the Constitutional Convention delegates and the Legislature, whose purpose was to prevent the making of public decisions in secret meetings. The Missoulian argues that closure of the job performance evaluations was unjustified because the demands of privacy did not clearly exceed the merits of public disclosure.

16

Article II, section 9 of the Montana Constitution provides:

> "No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure." (emphasis added)

The Open Meeting Act incorporates the same closure standard:

> "(1)    All meetings of public or governmental bodies, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations or agencies supported in whole or in part by public funds or expending public funds shall be open to the public.

> "(2)    Provided, however, the presiding officer of any meeting may close the meeting during the time the discussion relates to a matter of individual privacy and then if and only if the presiding officer determines that the demands of individual privacy clearly exceed the merits of public disclosure. The right of individual privacy may be waived by the individual about whom the discussion pertains and, in that event, the meeting shall be open." Section 2-3-203, MCA (emphasis added).

The constitution appears to prescribe two different standards for determining whether a privacy interest prevails over a competing interest. In Montana Human Rights Division, we recognized that a privacy interest will yield only to a compelling state interest. There, we found that a compelling state interest arose under the equal protection clause of the Montana Constitution. 649 P.2d at 1288, 39 St.Rep. at 1510. The Missoulian argues that here a compelling state interest arises simply because the right to know is of constitutional magnitude; the right to know being a compelling state interest, privacy must yield. Under the Missoulian's theory, it appears the right to know would always prevail over individual privacy.

However, the right to know is not absolute. The more specific closure standard of the constitutional and statutory provisions requires this Court to balance the competing constitutional interests in the context of the facts of each case, to determine whether the demands of individual privacy

17

clearly exceed the merits of public disclosure. Under this standard, the right to know may outweigh the right of individual privacy, depending on the facts.

Before balancing these interests, however, it must be determined more precisely what interests are at stake. This determination includes consideration of various facets of the public interest and is required by the language of the right to know provision, which calls for a balancing of the "demands of individual privacy" and the "merits of disclosure."

The Missoulian would limit the inquiry to a contest between competing constitutional interests in the abstract, without consideration of aspects of the public interest other than the general "right to know." But a broader inquiry is required by the constitutional and statutory provisions and has been employed by this Court in previous cases. We reject the restrictive approach suggested by the Missoulian.

In Montana Human Rights Division, we considered the policies behind the investigatory powers of the HRC, including the right to be free from discrimination, the need for accurate and effective resolution of complaints and the adverse consequences of denying the HRC access to information. We also considered the inconvenience or impracticality of alternative methods of obtaining the information and the "practical realities of the situation." 649 P.2d at 1289, 39 St.Rep. at 1511.

In Mountain States Telephone and Telegraph Co. v. Dept. of Public Service Regulation (Mont. 1981), 634 P.2d 181, 38 St.Rep. at 1479, we addressed the issue of whether and under what conditions corporate trade secrets protected by the privacy clause must be publicly disclosed under the constitutional right to know. Mountain States had offered to disclose the information to the Public Service Commission

18

(PSC) under protective order, but the PSC refused to issue a protective order. We rejected the argument that because the information was necessary to the PSC's rate-making determination, public disclosure was required. 634 P.2d at 187, 38 St.Rep. at 1485-86.

We considered the policies behind the information-gathering powers of the PSC and:

> ". . . balanced the rights that all citizens acquired under the right to know provision of the state constitution with the purpose and function for which our laws compel disclosure . . .. The right to know provision was designed to prevent the elevation of a state czar or oligarchy; it was not designed for, nor will be substitute, the tyranny of a proletariat . . .. Any other citizen . . . may also have access to the trade secret, provided his or her interest relates to the ratemaking function of the PSC." 634 P.2d at 189, 38 St.Rep. at 1488.

Montana Human Rights Division and Mountain States indicate that it is appropriate and necessary to balance the competing rights in the context of the purposes, functions and needs of the governmental entity involved and the purposes and merits of the asserted public right to know.

The substantial value of confidential evaluations is apparent. The Board, the Commissioner and the presidents all rely on confidential evaluations to effectively improve job performance. These evaluations allow the Board and the president to gain an accurate view of the effectiveness of the administration, its strengths and weaknesses. The Commissioner stated that these sessions were of "immeasurable assistance" to him and the Board in managing the university system. The procedure helps to "head off" potential problems before they damage a university unit. It allows the Board members and presidents to test their perceptions against those of people from a cross-section of the university and community. The overall effectiveness and quality of the system is enhanced and these results accrue to the benefit of the public.

The participants uniformly believe that open evaluation sessions would be detrimental. The Chairman and the Commissioner stated that the effectiveness of the sessions in job performance improvement and other benefits depended in large part upon confidentiality. The Commissioner stated that public disclosure would inhibit candid evaluations from faculty, staff, and other interviewees, discourage presidents from making candid self-evaluations, and would damage the presidents' ability to govern. The District Court found that frank, honest and critical evaluations would not occur without confidentiality. The state's ability to attract top presidential candidates or retain its current presidents would suffer. Both the Chairman and the Commissioner indicated that the sessions probably would not be held unless they were confidential. All of the presidents use confidential evaluations for their staff and believe they are an essential tool for effective management.

The privacy interests of the presidents would suffer greatly from disclosure. Also, the privacy of faculty, staff and other interviewees whose names or comments were discussed would be violated or jeopardized. To allow public disclosure of the confidential comments of the anonymous interviewees arguably contravenes the legislative policy of protecting the confidentiality of communications made to public officials where the public interest would suffer by the disclosure. Section 26-1-810, MCA. The disadvantages of public disclosure are substantial.

The Missoulian argues that public disclosure would further the public interest in several ways, including fostering public confidence in public institutions, maintaining the accountability of public officials, assuring public access to information to allow evaluation of public expenditures, and preventing the secret conduct of government

20

and usurping of the people's sovereignty. However, the Missoulian has failed to show how any of these public interests would be furthered by public disclosure or hindered by confidentiality in this case. The Missoulian has shown no relation between the information involved here and the objectives of the right to know provision. The discussions concerned personal relationships and personalities, subjective evaluation of various staff and faculty, and the presidents' management style, methodology and personality. This information may make interesting or sensational news copy, but we conclude that public disclosure is not in the public interest.

The Missoulian argues that when the Legislature deleted the personnel exception to the Open Meeting Act, it indicated an intent to open personnel evaluations to the public. However as the Board notes, the specific exceptions were apparently deleted in favor of a broad and flexible general exception. This was deemed necessary because it did not appear that the specific exceptions were broad enough to encompass all situations where the right of privacy might exceed the merits of public disclosure. See Official Minutes, House State Administration Committee, January 27, 1977. The Missoulian's suggestion that the Legislature intended personnel evaluations to be open to the public is unconvincing.

We hold that the demands of individual privacy of the university presidents and other university personnel in confidential job performance evaluation sessions of the Board of Regents clearly exceed the merits of public disclosure. We affirm the District Court's findings that these confidential job performance evaluations are in the public interest and that the demands of individual privacy clearly exceed the merits of public disclosure.

21

III

The final issue is whether closure of job performance evaluation meetings is necessary to protect the presidents' privacy interests or whether alternative methods exist for protecting individual privacy in evaluation meetings.

The Missoulian contends that closure of the evaluation meetings was not necessary to protect any private matters that actually were discussed at the meeting. The Missoulian argues that routine parliamentary methods are available for segregating private from non-private matters in the evaluation sessions. These include protecting the identity of those discussed, "agenda scheduling" (scheduling the discussion of specific private matters and closing the session for only that discussion), and objections and side bar conferences (as used in objecting to inadmissible evidence in trials). The Missoulian argues these alternatives are practical and sufficient to protect privacy. The Board argues that these alternatives are impractical and inadequate to protect privacy; partial closure would fail to accomplish its purpose and would prevent the evaluations from being effective.

In Montana Human Rights Division, the City of Billings argued that the information sought by HRC could be altered in such a way as to protect the identities of the employees and thus make the intrusion less objectionable. We noted that this would limit the accuracy and completeness of the information sought. 649 P.2d at 1289, 39 St.Rep. at 1512. Here, one purpose of the confidential evaluation procedure is to encourage full uncensored comment by all involved. To alter the information in an attempt to protect identities would frustrate this purpose. Moreover, this alternative would do nothing to protect the principal privacy interests at stake -- those of the presidents. In Montana Human Rights

22

<u>Division</u>, this Court found that an HRC regulation which allowed public disclosure of "data or abstracts derived from such information in a form which does not reveal the identity of the charging party, respondent, or person supplying the information" was inadequate to protect the right of privacy. 649 P.2d at 1290, 39 St.Rep. at 1512-13. We prohibited release of information which "<u>suggests</u> the identity of employees . . .." 649 P.2d at 1291, 39 St.Rep. at 1514 (emphasis added). The identity of the presidents and other employees who were discussed was more than "suggested" by the discussion that occurred at the evaluation sessions.

Agenda scheduling also presents significant problems. The Missoulian's explanation of this method demonstrates its impracticality. The Missoulian suggests that "if in the course of an evaluation a participant feels he is intruding on matters of individual privacy, he is to state his concern to the presiding officer who will make a decision on whether the meeting should be closed for that discussion." Presumably a side bar conference would then be had to resolve the matter. This procedure would transform the evaluation into a procedural exercise rather than an informal discussion of the employee's performance. The open and informal character of the evaluations, which is directly related to their effectiveness, would be lost.

This type of procedure is arguably suggested by the language of the Open Meeting Act, which states that "the presiding officer of any meeting may close the meeting during the time the discussion relates to a matter of individual privacy . . .." Section 2-3-203(2), MCA. However, most if not all of the discussion at the May 3, 1980 meeting related to matters of individual privacy. There was so much interweaving of sensitive material that it would have been impossible by use of agenda scheduling to separate private

23

matter from non-private, to protect privacy, or to avoid destroying the effectiveness of the evaluations.

The agenda scheduling procedure suggested by the Missoulian is rather vague. The Missoulian has not shown how Board members would know in advance that a private matter was about to be raised nor how the Board could avoid the suggestion of private matter in calling for a side bar conference. While being questioned about this procedure in deposition, Missoulian publisher Tom Brown indicated that this procedure would "take a little risk with that kind of thing." We believe such a procedure would fail to protect privacy or would sanitize the evaluations beyond effectiveness.

As the Board argues, agenda scheduling is feasible only if we adopt the narrow view of privacy urged by the Missoulian. Such a procedure artifically compartmentalizes the discussion. Use of trial procedures would raise the sessions to the level of adversarial proceedings and destroy the public benefits of informal and candid evaluations. A careful review of the depositions and other documents in the record demonstrates the complete impracticality of partial closure. The flow of the discussion and interchange of questions at the meetings continuously raised matters of privacy inappropriate for public discussion. In short, closure appears the only practical and effective method of conducting job performance evaluations.

We hold on these facts that closure of the job performance evaluations was necessary to protect the individual privacy of the university presidents and other university personnel. Neither the constitutional nor statutory right to know provision was violated. We affirm the judgment of the District Court.

_____
Justice

24

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices