JUSTICE McKINNON,
dissenting.
¶62 In my view, a City employee has no reasonable expectation of privacy in viewing pornographic materials over the Internet using a City computer during work hours-particularly when there is a policy in place which specifically advises employees that use of the Internet is not anonymous and may be monitored. Moreover, placement of a final disciplinary report (the Corrective Action Form) into an employee’s personnel file does not transform the employee’s open and pervasive access to pornographic material over the Internet into a private activity. The Court, by misstating the question as “whether the Employees had an actual expectation of privacy in their identities in relation to internal disciplinary proceedings, not as to their employer’s knowledge of the Internet usage,” Opinion, ¶ 20 (emphasis added), redefines the inquiry in order to recognize a privacy interest that other courts have uniformly held to be unreasonable. After finding that the Employees were ‘hot in a position of public trust” and that “the misconduct resulting in the discipline was not a violation of a duty requiring a high level of public trust,” Opinion, ¶ 50, the Court concludes that the name, position, and department of a City employee accessing pornography may not be disclosed to the public. In my view, it is not necessary to decide whether the Employees are in positions of “public trust,” because the Employees do not have an expectation of privacy, which Montanans are willing to accept as reasonable, in the fact that they accessed, posted, and enjoyed pornographic material while working for a public employer with an Internet use policy.
¶63 All City employees are subject to the City’s “Acceptable Use” policy, which applies to “all equipment, systems and tools used for electronic communication, local area networks, computer networks, the Internet and e-mail.” Among other things, the policy prohibits use of City computers to access or store “offensive graphical images.” It also prohibits ‘iujsing any means to defeat security systems on any *428 computer network” and the “propagation of computer worms and viruses.” Employees are advised that ‘tu]se of the Internet may be monitored by the City.” Moreover, the policy states:
The City’s Internet hosts are traceable to the City. Users using City-provided Internet accounts should not assume they are provided any degree of anonymity. Outside users who want to identify machines associated with the City can do so easily. [Emphasis added.]
¶64 In the spring of 2012, the City conducted internal investigations into the Internet activity of five City employees on City-provided computers and ultimately issued written Corrective Action Forms suspending each employee for five days without pay. The nature of the violations were set forth in the Corrective Action Forms as follows:
1. Daily logs of each of the five employees showed a pattern of Ts]eeking out pictures of women on the internet that were sexual in nature.” These images included “nude adults,” “pictures that were pornographic in nature,” and “scantily clad adults that were inappropriate for the workplace.”
2. Daily logs also showed a pattern of‘te]xcessive amounts of time being spent on non-work related searches while ... being compensated to perform ... assigned duties.”
3. One of the employees had conducted “[s]earches on blog, foreign country and image hosting sites. Specifically, links were found to a Polish site with adult content that contained file sharing functionality, subsequently increasing the potential of a virus threat to the City s computer network.”
4. Another employee had saved four images of “scantily clothed and nude adults and pictures that were pornographic in nature.”
5. Yet another employee had sought out “pictures of women associated with escort services.”
As noted, the City disciplined the Employees by imposing five days of suspension on each. Although the suspensions were without pay, the City did not dock any pay of the employees for the “excessive” amount of work time they had spent viewing pornography.
¶65 As the Court observes, the documents requested by the Gazette have already been disclosed. Opinion, ¶¶ 9, 17. However, certain information has been redacted from those documents-information that the Gazette contends the public has a constitutional right to know. Specifically, the information redacted in the Corrective Action Forms includes the employee’s name, the employee’s position, the employee’s department, and the name of the employee’s supervisor.
¶66 Despite this Court’s knowledge-acquired through our in-camera *429 review of the unredacted Corrective Action Forms4hat some of the disciplined employees held upper-level positions and/or were involved in law enforcement, we refuse to apply that knowledge and analysis in resolving this case. We avoid the analysis by stating: ‘The City averred that the Employees were not elected officials, department heads, or high management.” Opinion, ¶ 42 (emphasis added). But the Court knows what positions the Employees held because we, like the District Court, reviewed the documents, which are part of the record on appeal. We nevertheless ignore the Employees’ positions in spite of our precedent and the Gazette’s argument that the public has a constitutional right to assess whether the City meted out discipline fairly. We avoid an analysis that incorporates consideration of the Employees’ specific positions by determining that the Gazette did not advance this argument (How could it, given that the Gazette was not privy to that information?) and that “the District Court did not make any finding that any of the Employees hold any particular position of trust with regard to public spending or public safety.” Opinion, ¶ 42. In failing to recognize the significance of the redacted information to the Gazette’s investigation, we have subjectively limited the Gazette’s inquiry and decided the direction the Gazette’s investigation and reporting should take. Montana’s constitutional provision embracing the citizenry’s right to know is premised on the right to have information disseminated and available so that the public-not this Court-may draw its own inferences and conclusions from the information and thereby make informed decisions regarding their governmental bodies. The unfiltered dissemination of information is fundamental to the exercise of Montana’s constitutional right to know and is limited only where an individual has a reasonable privacy interest that “clearly exceeds” the merits of public disclosure. Mont. Const, art. II, §9.
¶67 Although the Court states that “[t]he only argument offered by the Gazette in favor of public disclosure is that ‘[ojpenness promotes fairness and thwarts cronyism,’ ” Opinion, ¶ 55 (second brackets in original), the Gazette has actually advanced several arguments in support of its request for disclosure-arguments which the Court fails to acknowledge. First, the Gazette has argued that in violating the City’s Acceptable Use policy, the Employees acted to defeat the security system on the City’s computer network and potentially compromised the City’s workplace by breaching security devices and introducing viruses from international pornography websites. While the Court states that “the specific allegations of misconduct, accessing adult or pornographic websites, are not a focus of this analysis,” *430 Opinion, ¶ 41, the Gazette argues that the pornographic nature of the material and the potential for security breaches are relevant in determining what society recognizes as a reasonable expectation of privacy. We are required to examine the privacy interest “ ‘in the context of the facts of each case.’ ’’Associated Press, Inc. v. Mont. Dept. of Revenue, 2000 MT 160, ¶ 24, 300 Mont. 233, 4 P.3d 5 (emphasis omitted) (quoting Missoulian v. Bd. of Regents of Higher Educ., 207 Mont. 513, 529, 675 P.2d 962, 971 (1984)). Accordingly, we cannot avoid examining the content of the material at issue and the security threats posed by the individuals’ actions when assessing whether society would recognize the privacy interest as reasonable. I thus do not agree that Tt]he fact that the images viewed on the Employees’ computers ‘had sexual content does not influence the primary analysis.’ ” Opinion, ¶ 41. I seriously question whether society is willing to protect the privacy of a public employee who breaches security devices, thus exposing the City’s computer network to damage from viruses and other malware, in order to view pornography on a public computer during work hours. The pornographic nature of the material is important, in the context of all other factors.
¶68 Second, the Gazette maintains that the public has an interest in knowing whether public employees are violating the law. The Gazette argues that although no charges have been filed, the Employee’s conduct can be characterized as illegal under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Gazette points to several court decisions which have held that violating the terms of an “acceptable use”policy may constitute a federal offense. See e.g. U.S. v. John, 597 F.3d 263, 271-73 (5th Cir. 2010); U.S. v. Rodriguez, 628 F.3d 1258, 1263 (11th Cir. 2010); cf. U.S. v. Teague, 646 F.3d 1119, 1122 (8th Cir. 2011). Significantly, Montana has its own criminal offenses relating to the unlawful use of a computer. Section 45-6-311(l)(a), MCA, prohibits a person from knowingly or purposely “obtaining] the use of any computer, computer system, or computer network without consent of the owner.”The City’s Acceptable Use policy clearly establishes that employees are not authorized to use City computers to access pornographic materials over the Internet. Arguably, Montana’s theft statute is likewise implicated by the Employees’ conduct. Pursuant to §45-6-30l(2)(a), MCA, a person commits the offense of theft when the person purposely or knowingly obtains, by deception, control over another’s property (money paid in the form of wages) with the purpose of depriving the owner (the City) of that property. Montana additionally has an “official misconduct” statute that makes it unlawful for a “public servant” to “knowingly perform[ ] an act in an *431 official capacity that the public servant knows is forbidden by law.” Section 45-7-401(l)(b), MCA. ‘Public servant” means “an officer or employee of government.” Section 45-2-101(64)(a), MCA (emphasis added). This Court’s precedent establishes that the public has the right to know about unlawful activity of public employees. Great Falls Tribune Co. v. Cascade Co. Sheriff, 238 Mont. 103, 107, 775 P.2d 1267, 1269 (1989); Bozeman Daily Chron. v. City of Bozeman Police Dept., 260 Mont. 218, 227, 859 P.2d 435, 440-41 (1993). Furthermore, our constitutional right to know protects the right to receive information about decisions of government officials to prosecute or commence a criminal investigation. The fact that ‘ho criminal charges have been filed or are contemplated,” Opinion, ¶ 46, puts the cart before the horse-fehis is precisely the information the public has the right to know in order to evaluate the conduct of public officials.
¶69 Third, the Gazette also maintains that the public has the right to scrutinize whether the discipline the City imposed on the Employees was fair. While the Court seemingly finds it significant that the punishment meted out in other cases was “severe” while the punishment meted out in the present case was less so, Opinion, ¶ 44, I believe such an assessment of government discipline is best left for citizens to determine after being presented with adequate information. The Gazette specifically argued before the District Court that during the same timeframe when the Employees here were given five-day suspensions, five employees with the City landfill also received five-day suspensions for taking trash outside the City during off-work hours. The Gazette maintained that the public has a right to scrutinize the discipline imposed and to question whether there is “some distinction between high-level employees” who got the same punishment “as the people in the landfill.” Likewise, on appeal, the Gazette again questions whether “the status of the employees” accounts for the punishments that the City imposed-information which the Gazette maintains the public has a constitutional right to know.
¶70 Lastly, the Gazette argues that a substantial amount of taxpayer money was wasted on time the Employees spent accessing pornographic materials and that the investigation likewise has cost taxpayers money and public resources. The Gazette maintains that the public has an interest in how their government spends public funds, just as the public had a right to know the identity of the police department employee who misappropriated public funds in Billings Gazette v. City of Billings, 2011 MT 293, ¶¶ 22-27, 362 Mont. 522, 267 P.3d 11.
*432 ¶71 In light of the foregoing, the Gazette’s arguments for public disclosure cannot be dismissed as merely seeking to promote fairness and thwart cronyism. Opinion, ¶ 51. Rather, in my opinion, the Gazette has set forth these particular arguments as components of a more general argument that disclosure fosters public confidence in public institutions and maintains accountability of public officers.
¶72 Determining whether public documents must be disclosed requires a balancing of the public’s right to know with any competing privacy interests.[1] Mont. Const, art. II, §§9, 10. Again, the balancing must be done in the context of the facts of each case. Yellowstone Co. v. Billings Gazette, 2006 MT 218, ¶ 20, 333 Mont. 390, 143 P.3d 135. A person has a constitutionally protected privacy interest when (1) the person has an actual or subjective expectation of privacy and (2) society is willing to recognize that privacy expectation as reasonable. Yellowstone Co., ¶ 20 (citing Lincoln Co. Commn. v. Nixon, 1998 MT 298, ¶ 16, 292 Mont. 42, 968 P.2d 1141).
¶73 In this case, the District Court observed that neither party had disputed the first prong of the test-actual or subjective expectation of privacy-and the District Court thus found that “the Employees did expect the fact they were disciplined for having misused public computers and the specifics regarding that misuse would be and remain private.”The District Court further determined, however, that the Employees’ subjective expectations of privacy were unreasonable in light of their knowledge that the City had the right to monitor their Internet usage and that they had no anonymity with respect to the sites they visited. In my judgment, the District Court’s conclusion was not only correct, but also consistent with that of numerous courts which have considered a public employee’s expectation of privacy and *433 decided that an Internet use policy negates any such expectation.
¶74 In U.S. v. Angevine, 281 F.3d 1130 (10th Cir. 2002), a university professor did not have a reasonable expectation of privacy in the contents of his computer given that the university had a computer policy explaining appropriate computer use and stating that usage could be monitored. The defendant could not have a reasonable expectation of privacy because reasonable university computer users should have been aware that network administrators and others were free to view data downloaded from the Internet. Angevine, 281 F.3d at 1134. In U.S. v. Simons, 206 F.3d 392 (4th Cir. 2000), government employees did not have a reasonable expectation of privacy in, the information stored on their computers where a policy stated that the employer could audit, inspect, and/or monitor employees’ use of the Internet. ‘This policy placed employees on notice that they could not reasonably expect that their Internet activity would be private.” Simons, 206 F.3d at 398. In Muick v. Glenayre Elecs., 280 F.3d 741 (7th Cir. 2002), an employee did not have a reasonable expectation of privacy in a laptop provided by his employer where the employer had notified the employee that it could inspect the laptop. The rationale set forth in the court’s opinion is useful:
Muick had no right of privacy in the computer that Glenayre had lent him for use in the workplace. Not that there can’t be a right of privacy ... in employer-owned equipment furnished to an employee for use in his place of employment. If the employer equips the employee’s office with a safe or file cabinet or other receptacle in which to keep his private papers, he can assume that the contents of the safe are private. But Glenayre had announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy that Muick might have had .... The laptops were Glenayre’s property and it could attach whatever conditions to their use it wanted to. They didn’t have to be reasonable conditions; but the abuse of access to workplace computers is so common (workers being prone to use them as media of gossip, titillation, and other entertainment and distraction) that reserving a right of inspection is so far from being unreasonable that the failure to do so might well be thought irresponsible.
Muick, 280 F.3d at 743 (citations omitted).
¶75 Additional authority finding that a public employer’s computer policy precludes a reasonable expectation of privacy includes Wasson v. Sonoma Co. Junior College Dist., 4 F. Supp. 2d 893, 905-06 (N.D. Cal. 1997) (policy giving employer right to access all information stored *434 on employees’ computers extinguished any reasonable expectation of privacy in files stored on the computers); Bohach v. City of Reno, 932 F. Supp. 1232, 1234-35 (D. Nev. 1996) (police officers did not have a reasonable expectation of privacy in their use of a pager system because the police chief had issued an order notifying all users that their messages would be logged); U.S. v. Hamilton, 778 F. Supp. 2d 651, 653-54 (E.D. Va. 2011) (public school employee lacked a reasonable expectation of privacy in emails that were stored on his work computer because the computer use policy stated that the contents of the computer were subject to inspection); cf. Am. Postal Workers Union v. U.S. Postal Serv., 871 F.2d 556, 560 (6th Cir. 1989) (postal employees had no reasonable expectation of privacy in their lockers because postal regulations and collective bargaining agreements both stated that the lockers were subject to examination and inspection at any time).
¶76 Although the above-cited authority is largely in the context of Fourth Amendment jurisprudence, the reasonableness of an expectation of privacy-fehat is, what society will recognize as legitimate-does not vary depending upon whether the argument is made under the Fourth Amendment or under Montana’s constitutional provision regarding an individual’s right of privacy.[2] Our precedent recognizes the validity of federal caselaw in the context of a right-to-know analysis, regarding whether a privacy interest is one that society is willing to recognize as reasonable. In Mont. Human Rights Div. v. City of Billings, 199 Mont. 434, 442-43, 649 P.2d 1283, 1287-88 (1982), we applied the standard set forth by the Supreme Court in Katz v. U.S., 389 U.S. 347, 88 S. Ct. 507 (1967), to evaluate what constituted a reasonable expectation of privacy in relation to the right to know. Katz was the landmark case that defined a constitutionally protected expectation of privacy, under the Fourth Amendment, as consisting of a subjective component and a reasonableness component. This Court has applied that test in search-and-seizure cases, see e.g. State v. Hill, 2004 MT 184, ¶ 24, 322 Mont. 165, 94 P.3d 752; State v. Allen, 2010 MT 214, ¶ 47, 357 Mont. 495, 241 P.3d 1045, in right-to-know cases, see e.g. Mont. Human Rights Div., 199 Mont. at 442-43, 649 P.2d at 1287-88; Great Falls Tribune, 238 Mont. at 105, 775 P.2d at 1268; *435 Billings Gazette, 2011 MT 293, ¶ 12, and in pure privacy cases, see e.g. Hastetter v. Behan, 196 Mont. 280, 282-83, 639 P.2d 510, 512-13 (1982); State v. Nelson, 283 Mont. 231, 239-42, 941 P.2d 441, 446-48 (1997); Gryczan, 283 Mont. at 449-50, 942 P.2d at 122.
¶77 I cannot accept that Montana citizens would recognize as reasonable, under Katz, Mont. Human Rights Div., or any other precedent, this Court’s willingness to shield the identities, positions, departments, and supervisors of public employees who access pornographic material on their work computers during work hours after having been warned that their computer usage would be monitored and that they cannot expect anonymity. I also am not willing to carve out an exception to the well-established test for determining a constitutionally protected expectation of privacy because we want to protect particular employees from embarrassment. The reasonableness of an expectation of privacy depends on what society deems is legitimate, and such a test cannot logically depend on whether a claim is asserted pursuant to search-and-seizure jurisprudence or precedent interpreting the right to know.
¶78 Contrary to the Court’s reasoning, see Opinion, ¶ 47, the City’s placement of the final disciplinary report in each Employee’s personnel file does not give the document protections that it otherwise would not have. The Employee’s privacy expectation has been extinguished by the Acceptable Use policy and is not resurrected by placing the Corrective Action Form into a personnel file. Actions of the Employees in choosing to access websites at work on a City computer with an Internet use policy in effect, for which there was no reasonable expectation of privacy, cannot subsequently be made private through actions of the City in placing the disciplinary report into the protective confines of the Employees’ personnel files. To allow a public employer to potentially subvert the right to know by concealing the contents of the objectionable material in a personnel file would undermine the public’s ability to evaluate the functioning of government and whether it is meting out discipline fairly and evenhandedly.
¶79 The rationale for protecting from disclosure the contents of a personnel file does not exist in this case. Arguably, the Corrective Action Form is more akin to the “due process letter” in Billings Gazette, 2011 MT 293, which we noted was different from the job performance evaluations of university presidents in Missoulian, 207 Mont. 513, 675 P.2d 962, and the employment applications in Mont. Human Rights Div., 199 Mont. 434, 649 P.2d 1283. As we stated in Mont. Human Rights Div., 199 Mont. at 442, 649 P.2d at 1287-88:
Employment records would reasonably contain, among less *436 sensitive information, references to family problems, health problems, past and present employers’ criticism and observations, military records, scores from IQ tests and performance tests, prison records, drug or alcohol problems, and other matters, many of which most individuals would not willingly disclose publicly. Some testing and disclosure (e.g., past employment records, prison records, drug or alcohol use) is a necessary part of many applications for employment; other information may be compiled by present employers or may be submitted by an employee in explanation of absence from work or poor performance on the job. It is clear that there is frequently pressure upon an employee to communicate these matters to his employer in the privacy of his boss’s office or on an application for employment or promotion. And while, as far as we know, respondents gave their employees no specific assurances of confidentiality, we believe that employees would reasonably expect such communication normally would be kept confidential.
¶80 Significant to our decision in Missoulian was a written policy that provided for confidentiality of self-evaluations. We noted that
the Board’s written evaluation policy stated that the self-evaluations would be confidential and the evaluation meetings would be conducted in “executive session.” The anonymous interviewees who commented on the presidents’ performance were promised confidentiality. It is undisputed that the six university presidents actually expected that the job performance evaluations would be private. [They] submitted their self-evaluations expecting confidentiality.
Missoulian, 207 Mont. at 523, 675 P.2d at 968. We held that these expectations of privacy were reasonable. Missoulian, 207 Mont. at 527, 675 P.2d at 970.
¶81 In contrast, the Acceptable Use policy here specifically advises that there is no confidentiality in the materials and the activities conducted on an employee’s computer. Furthermore, nothing in the Corrective Action Form contains sensitive information akin to an employment record, such as family references, health problems, prison records, or drug and alcohol issues. The Corrective Action Form is the final report of the discipline a public employer has imposed on its employee. The Gazette is not requesting the Employees’ entire personnel files, employment records, or performance evaluations; it is requesting the final reporUthe end product-ef the City’s investigation into misconduct of its employees.
¶82 ‘Government offices are provided to employees for the sole *437 purpose of facilitating the work of an agency. The employee may avoid exposing personal belongings at work by simply leaving them at home.” O’Connor v. Ortega, 480 U.S. 709, 725, 107 S. Ct. 1492, 1501-02 (1987) (plurality). Likewise, a public employee who is paid by taxpayers does not have a reasonable expectation of privacy in viewing pornography during work hours on a City computer, particularly when he/she has been advised by the City that computer use is not anonymous.
¶83 The District Court concluded that because “the Employees’ privacy expectations were unreasonable under these circumstances, their privacy rights do not clearly exceed the merits of public disclosure.” Mont. Const, art. II, § 9. I agree with this conclusion. Although public humiliation may be an unfortunate consequence of disclosure, it is not a defense to disclosure. To the extent the Court holds otherwise, I strongly disagree.
JUSTICE COTTER joins the Dissent of JUSTICE McKINNON.

 The Court declines to address the threshold issue of whether the documents requested by the Gazette are public documents for purposes of Article II, Section 9, ‘because all of the requested documents have already been disclosed” and “any further discussion as to whether these forms are considered public documents has been rendered moot.” Opinion, ¶ 17. The entire contents of the requested documents have not been disclosed, however. Moreover, under our caselaw, our analysis requires a three-step process that includes consideration of whether the documents are public. Becky v. Butte-Silver Bow Sch. Dist., 274 Mont. 131, 136, 906 P.2d 193, 196 (1995). Finally, the City has raised and argued the question whether the documents are public. For all of these reasons, I believe we are obliged to address the issue. Doing so, I would hold that the Corrective Action Forms are the result of an investigation conducted by a public employer and are public documents within the meaning of Article II, Section 9, pursuant to Great Falls Tribune, 238 Mont. at 107, 775 P.2d at 1269-70; Becky, 274 Mont. at 138, 906 P.2d at 197; and Billings Gazette, 2011 MT 293, ¶ 29.

 It is well established that Montana’s Constitution affords individuals broader protection of privacy than does the federal constitution. Gryczan v. State, 283 Mont. 433, 448-49, 942 P.2d 112, 121-22 (1997); State v. Malkuch, 2007 MT 60, ¶ 12, 336 Mont. 219, 154 P.3d 558.