DA 12-0739

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 334

THE BILLINGS GAZETTE, a division
of LEE ENTERPRISES,

      Plaintiff and Appellee,

v.

THE CITY OF BILLINGS,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 12-1349
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Gerald B. Murphy, Emily Jones; Moulton Bellingham PC;
Billings, Montana

      For Appellee:

            Martha Sheehy; Sheehy Law Firm; Billings, Montana

Submitted on Briefs:  August 28, 2013
Decided:  November 8, 2013

Filed:

_____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant City of Billings (City) appeals the order of the Thirteenth Judicial District Court, Yellowstone County, ordering that it release copies of investigative documents and disciplinary forms without redactions for information identifying five City employees. The five employees had been disciplined by the City for inappropriate computer usage on their work computers. The Billings Gazette (Gazette) sought access to documents detailing the investigation into and punishment of the misconduct. The City disclosed some documents but refused to release the disciplinary corrective action forms, and redacted all information that could be used to identify the five employees or uninvolved third parties alleging that to do so would violate the employees' right to privacy. The District Court ruled in favor of the Gazette and ordered that unredacted copies of all documents, including the corrective action forms, be provided to the newspaper. The City appealed, and obtained an order staying judgment through appeal as to the identifying information, but not as to the corrective action forms. We reverse.

¶2 We restate and consider the following issues:

¶3 *1. Did the District Court err by ordering that identifying information for five City employees disciplined for accessing pornography on their government computers be released to the Gazette?*

¶4 *2. Did the District Court abuse its discretion by denying the Gazette's request for attorney fees?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Between March and June of 2012, the City discovered five city employees (Employees) had possibly been using their respective public City computers to access

adult and/or pornographic material on the Internet during work hours. The City conducted separate internal investigations into the Internet activity of each Employee. Upon conclusion of each investigation, the City issued a written corrective action determination to each Employee, setting forth a summary of the evidence gathered during the investigation and the disciplinary action being taken by the City as a result. Each of the Employees was suspended for five days without pay.

¶6 On August 24, 2012, the Gazette requested copies of "all written reprimands or records of other disciplinary actions affecting employees of the City Attorney's office between February 1, 2012 and August 24, 2012." On August 28, 2012, the Gazette requested the City provide a list of all city employees who had been disciplined within the prior six months. On August 31, 2012, the Gazette requested "documentation of the searches/filtering that indicated a pattern of attempts to access blocked sites in the cases involving the five city workers suspended for accessing (or attempting to access) inappropriate websites[;] any reports by [the City's Chief Information Office] regarding such searches; any communications between city employees . . . [and] any due process letters resulting from these incidents." The City denied the first two requests, citing the employees' privacy rights but, in response to the third request, provided copies of its investigative documents relating to the Internet activity of the Employees and email correspondence sent in connection with the City's internal investigation of the Employees. These documents were redacted to omit the names and other identifying

3

information of the Employees and uninvolved third persons. The City did not provide copies of the disciplinary corrective action forms for any of the Employees.

¶7 The Gazette filed a Petition for Declaratory Relief and Writ of Mandamus. The Gazette asserted the documentation compiled by the City during and as a result of the investigation into unauthorized computer usage by disciplined City employees was subject to release under the "right to know" provision of Article II, Section 9 of the Montana Constitution and § 2-6-102, MCA, and that any privacy interest the disciplined employees may have in the information being requested did not clearly exceed the public's right to know. The Gazette also requested its attorney fees incurred in enforcing its constitutional rights, pursuant to §§ 2-3-221 and 27-8-313, MCA.

¶8 The City filed a Motion for *in camera* inspection of the demanded documents to determine whether the demands of privacy outweighed the public's right to know under these circumstances. On December 5, 2012, following the inspection, the District Court entered its Order and Decision granting the Gazette's petition for declaratory judgment but denying its request for attorney fees. The District Court ordered the City to turn over the corrective action forms and all other requested documents, with redactions only for identifying information concerning uninvolved third parties.

¶9 The City simultaneously filed this appeal and a motion before the District Court to stay the order pending appeal to prevent the issues from being rendered moot. The District Court granted the motion to stay with regard to redactions for names and identifying information of the Employees, but found that the Gazette was entitled to

redacted copies of the corrective action forms. The District Court attached redacted copies of the corrective action forms to its order granting a stay.

## STANDARD OF REVIEW

¶10 A district court's interpretation of law is reviewed to determine whether the court's interpretation of the law is correct. *Jefferson Co. v. Mont. Stand.*, 2003 MT 304, ¶ 9, 318 Mont. 173, 79 P.3d 805. We review a district court's findings of fact to determine whether they are clearly erroneous. *In re M.A.L.*, 2006 MT 299, ¶ 17, 334 Mont. 436, 148 P.3d 606. We review a district court's award or denial of attorney fees for an abuse of discretion. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *Disability Rights Mont. v. State*, 2009 MT 100, ¶ 13, 350 Mont. 101, 207 P.3d 1092.

## DISCUSSION

¶11 *1. Did the District Court err by ordering that identifying information for five City employees disciplined for accessing pornography on their government computers be released to the Gazette?*

¶12 Montana's right to privacy is established in Article II, Section 10 of the Montana Constitution:

> *Right of privacy.* The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

¶13 Often at issue with this provision is the public right to know, also established in the Montana Constitution. Article II, Section 9 of the Montana Constitution provides:

> *Right to know.* No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies

5

of state government and its subdivisions, *except in cases in which the demand of individual privacy clearly exceeds the merits*. [Emphasis added.]

¶14 We have held that these competing interests must be balanced "in the context of the facts of each case, to determine whether the demands of individual privacy clearly exceed the merits of public disclosure. Under this standard, the right to know *may* outweigh the right of individual privacy, depending on the facts." *Missoulian v. Bd. of Regents of Higher Educ.*, 207 Mont. 513, 529, 675 P.2d 962, 971 (1984) (emphasis in original).

¶15 An examination of a request under the public right to know provision of the Montana Constitution requires a three-step process:

> First, we consider whether the provision applies to the particular political subdivision against whom enforcement is sought. Second, we determine whether the documents in question are "documents of public bodies" subject to public inspection. Finally, if the first two requirements are satisfied, we decide whether a privacy interest is present, and if so, whether the demand of individual privacy clearly exceeds the merits of public disclosure.

*Becky v. Butte-Silver Bow Sch. Dist. No. 1*, 274 Mont. 131, 136, 906 P.2d 193, 196 (1995). No single rule or policy can be used to determine what information may be released upon public request because each request requires a fact specific, case-by-case analysis of the interests at issue and a balancing of the demands of individual privacy and the merits of public disclosure. *Havre Daily News v. Havre*, 2006 MT 215, ¶ 17, 333 Mont. 331, 142 P.3d 864.

¶16 The City does not dispute that it is subject to Article II, Section 9 of the Montana Constitution. The City argues that the inquiry should end with the second prong of the test: whether the investigative records and corrective action forms at issue are "documents of public bodies." Though not raised by the Gazette, mootness is a threshold issue the Court must resolve before the merits of the dispute can be decided. *Havre Daily News*, ¶ 31. "'A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy.'" *Havre Daily News*, ¶ 31 (quoting *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, 974 P.2d 1150).

¶17 We decline to address the issue of whether the documents requested by the Gazette are public documents because all of the requested documents have already been disclosed. The investigative records were voluntarily released to the Gazette with only Employee and third-party names and identifying information redacted. Additionally, the corrective actions forms with redactions only for Employee identifying information (name, job title, and department) have been turned over to the Gazette. Though the corrective action forms were disclosed by the District Court in its order granting a stay, rather than by the City, the forms have nevertheless been disseminated and any further discussion as to whether these forms are considered public documents has been rendered moot. Thus the only remaining issue is whether the Employees had a reasonable expectation of privacy in their identifying information in relation to the internal disciplinary proceedings that outweighs the public's right to know.

7

**A. Constitutionally Protected Privacy Interest**

¶18    To determine whether a person has a constitutionally protected privacy interest, we consider (1) whether the person has a subjective or actual expectation of privacy, and (2) whether society is willing to recognize that expectation as reasonable. *Mont. Human Rights Div. v. Billings*, 199 Mont. 434, 442, 649 P.2d 1283, 1287 (1982). Actual expectation of privacy is necessarily a question of fact that requires a determination of whether the individual whose privacy is at issue had notice of possible disclosure. *Havre Daily News*, ¶ 23; *Disability Rights Mont.*, ¶ 22.

¶19    The District Court found "the Employees did expect the fact they were disciplined for having misused public computers and the specifics regarding that misuse would be and remain private." The Gazette counters that no actual expectation of privacy could exist here because the City's Internet use policy for employees provides that "[u]sers using City-provided Internet accounts should not assume they are provided any degree of anonymity." Additionally, the policy states that "[u]se of the Internet may be monitored by the City."

¶20    The precise question is whether the Employees had an actual expectation of privacy in their identities in relation to internal disciplinary proceedings, not as to their employer's knowledge of their Internet usage. Only the latter is addressed by the City's policy. If the question was whether they held an actual expectation that the City would not monitor their usage, clearly the answer would be no. However, the City's Internet usage policy alone is insufficient to render clearly erroneous the District Court's finding

8

that the Employees had an actual expectation that "the fact they were disciplined for having misused public computers . . . would be and remain private."

¶21 Having concluded the Employees had an actual or subjective expectation of privacy, we next must determine whether society would be willing to recognize that expectation as reasonable. Whether society is willing to accept an expectation of privacy as reasonable is a determination of law that requires

> reasoned consideration of the specific facts underlying the dispute. To provide but a few examples, the following inquiries may prove relevant in evaluating the reasonableness of an individual's expectation of privacy: (1) attributes of the individual . . . and whether the individual holds a position of public trust; (2) the particular characteristics of the discrete piece of information; and (3) the relationship of that information to the public duties of the individual.

*Havre Daily News*, ¶ 23 (citations omitted). The reasonableness of an expectation of privacy "may vary, even regarding the same information and the same recipient of that information." *Mont. Human Rights Div.*, 199 Mont. at 443, 649 P.2d at 1288.

¶22 In order to examine this fact specific question of law, it is important to undertake a review of our prior decisions relating to the reasonableness of public employees' expectations of privacy when balanced against the public's right to know.

¶23 In *Montana Human Rights Division*, the Human Rights Commission (HRC) requested personnel records of complainants and certain other employees in order to investigate allegations of discrimination based on sex, race, marital status, and/or union membership. 199 Mont. at 436, 649 P.2d at 1284-85. The City refused to release non-complainant files, citing those individuals' right to privacy. *Mont. Human Rights Div.*,

9

199 Mont. at 437, 649 P.2d at 1285. We noted that employment records reasonably contain references to family, health, or substance abuse problems, employer criticisms, test scores, prison or military records, and many other things an employee would reasonably expect to be confidential. *Mont. Human Rights Div.*, 199 Mont. at 442, 649 P.2d at 1287-88.

¶24 We ultimately held that, though the information being requested was subject to the right to privacy, the right was nevertheless outweighed by other considerations, including the right to equal protection and the HRC's authority to investigate claims of discrimination. *Mont. Human Rights Div.*, 199 Mont. at 442-44, 649 P.2d at 1287-89. We rejected the City's argument that redaction of the names could reduce the intrusion on the non-complainants' privacy because the names alone could be indicators of sex, race, or even marital status, information which may not be available in the rest of the file. *Mont. Human Rights Div.*, 199 Mont. at 446, 649 P.2d at 1289. Though we found that the right to privacy was outweighed by the HRC's right to know, we required a protection order to restrict release of identifying information to the public. *Mont. Human Rights Div.*, 199 Mont. at 449, 649 P.2d at 1291.

¶25 Two years later, in *Missoulian*, we held that the individual privacy interests of six university presidents in confidential job performance evaluations clearly exceeded the merits of public disclosure. 207 Mont. at 533, 675 P.2d at 973. The Missoulian had sought access to a meeting of the Board of Regents (Board) and the Commissioner of Higher Education (Commissioner) where the presidents' job performance was discussed,

10

as well as evaluation documents considered by the Board. *Missoulian*, 207 Mont. at 517, 675 P.2d at 964-65. The request was denied by the Board due to privacy concerns. *Missoulian*, 207 Mont. at 517, 675 P.2d at 964-65.

¶26 We held that "time, place and status are factors in the reasonableness determination. . . . [T]he determination should include consideration of *all* relevant circumstances, including the nature of the information sought." *Missoulian*, 207 Mont. at 523, 675 P.2d at 968 (emphasis in original). "[M]ere status does not control the determination. University presidents do not waive their constitutional protections by taking office." *Missoulian*, 207 Mont. at 526, 675 P.2d at 969. Confidentiality in personnel records and evaluations is especially important because such records include subjective opinions of the employee's performance that will vary with the person evaluating the employee, public disclosure could impede candid communication between employer and employee, and a supervisor could use the public nature of evaluations or ratings as a vindictive mechanism against employees she disliked. *Missoulian*, 207 Mont. at 527, 675 P.2d at 970 (citing *Trenton Times Corp. v. Bd. of Educ.*, 351 A.2d 30, 33 (N.J. Super. App. Div., 1976)). We found it reasonable to expect that information that has a "'lack of objective criteria, the potential for vindictiveness, the lack of an opportunity for the employee to rebut statements . . . and a substantial potential for abuse'" will be kept confidential. *Missoulian*, 207 Mont. at 527, 675 P.2d at 970 (quoting *Trenton Times*, 351 A.2d at 33). We concluded the presidents' right to privacy clearly outweighed general assertions that public disclosure would "foster[ ] public

11

confidence in public institutions, maintain[ ] the accountability of public officials, assur[e] public access to information to allow evaluation of public expenditures, and prevent[ ] the secret conduct of government and usurping of the people's sovereignty," without a showing of *how* any of these interests would be furthered or hindered by public disclosure. *Missoulian*, 207 Mont. at 532, 675 P.2d at 972.

¶27     In *Great Falls Tribune v. Cascade County Sheriff*, 238 Mont. 103, 107, 775 P.2d 1267, 1269 (1989), we held that the privacy interests in the identity of law enforcement officers disciplined for unlawful acts while on duty did not clearly exceed the merits of public disclosure. City police officers and county sheriff's deputies were involved in a chase to apprehend a suspect. *Great Falls Tribune*, 238 Mont. at 104, 775 P.2d at 1267. A deputy sheriff ran his car up onto a city sidewalk and struck the suspect, then on foot, but did not take him for medical treatment. *Great Falls Tribune*, 238 Mont. at 104, 775 P.2d at 1267. An investigation into the suspect's injuries resulted in one deputy being suspended, one police officer being fired, and two other police officers resigning when given the option to resign or be discharged. *Great Falls Tribune*, 238 Mont. at 104, 775 P.2d at 1267. The Great Falls Tribune sought the names of the disciplined officers. *Great Falls Tribune*, 238 Mont. at 104, 775 P.2d at 1268.

¶28     We affirmed the District Court's conclusion that society would not recognize a very strong expectation of privacy in the identity of law enforcement officers disciplined for serious misconduct while in the line of duty. *Great Falls Tribune*, 238 Mont. at 107, 775 P.2d at 1269. Law enforcement officers occupy positions of public trust because the

12

"public health, safety, and welfare are closely tied to an honest police force. The conduct of our law enforcement officers is a sensitive matter so that if they engage in conduct resulting in discipline for misconduct in the line of duty, the public should know." *Great Falls Tribune*, 238 Mont. at 107, 775 P.2d at 1269.

¶29 In *Flesh v. Board of Trustees of Joint School Dist. No. 2*, 241 Mont. 158, 166, 786 P.2d 4, 9 (1990), we concluded that an assistant school administrator had a reasonable expectation of privacy in a meeting to discuss allegations of wrongdoing that outweighed the public's right to know. Robert Flesh (Flesh) filed a complaint to void any decision made during the closed portion of a meeting where the school board heard a grievance filed by Flesh alleging that the assistant school administrator had maliciously made false statements against him. *Flesh*, 241 Mont. at 160, 786 P.2d at 6. Over Flesh's objections, the school board closed the presentation and deliberation portions of the meeting to the public. *Flesh*, 241 Mont. at 161, 786 P.2d at 6.

¶30 We noted that the grievance specifically asked the school board to take disciplinary action against the administrator, a request that would necessitate a review of his personnel record. *Flesh*, 241 Mont. at 166, 786 P.2d at 9. We held that "society is willing to recognize a privacy interest in a public employer's consideration of allegations involving an employee's character, integrity, honesty, and personality." *Flesh*, 241 Mont. at 165, 786 P.2d at 9. Since there was no showing of any public interest to be served by opening the meeting to the public, the privacy interest of the employee clearly outweighed the public's right to know. *Flesh*, 241 Mont. at 166, 786 P.2d at 9.

13

¶31    In *Citizens to Recall Mayor Whitlock v. Whitlock*, 255 Mont. 517, 522-23, 844 P.2d 74, 77-78 (1992), we held that a mayor, as an elected official, has no reasonable expectation of privacy in regard to an investigation of allegations of "sexually harassing public employees or of other misconduct related to the performance of his official duties." Then-Mayor James Whitlock of Hamilton had been accused by City Judge Martha Bethel of sexual harassment and discrimination. A citizens group filed suit seeking release of the investigatory report. *Whitlock*, 255 Mont. at 519-20, 844 P.2d at 76.

¶32    In affirming the District Court's order to release the report, we noted two important reasons that the mayor could not allege a reasonable expectation of privacy. *Whitlock*, 255 Mont. at 522-23, 844 P.2d at 77-78. First, an elected official must be subjected to public scrutiny because it is the public that has the responsibility for "hiring, disciplinary action, and supervision." *Whitlock*, 255 Mont. at 522, 844 P.2d at 77. Second, we noted that the nature of the information being sought was the result of an investigation into misconduct related to the performance of his official duties, rather than general performance evaluations or discussion of Whitlock's character, integrity, honesty, or personality. *Whitlock*, 255 Mont. at 523, 844 P.2d at 78. We held that sexual harassment allegations went directly to Whitlock's ability to properly carry out his public duties, and the report was therefore properly disclosed. *Whitlock*, 255 Mont. at 522, 844 P.2d at 77-78.

14

¶33 In *Bozeman Daily Chronicle v. Bozeman Police Department*, 260 Mont. 218, 220, 859 P.2d 435, 436 (1993), a cadet at the Law Enforcement Academy in Bozeman made an allegation of sexual intercourse without consent against an off-duty Bozeman city police officer. Following investigation, no criminal charges were filed, but the special prosecutor opined that "[the police officer] should not be allowed to continue working as a law enforcement officer because of inappropriate use of his position in relation to his contacts with women." *Bozeman Daily Chronicle*, 260 Mont. at 220, 859 P.2d at 436-37. The officer resigned the next day. *Bozeman Daily Chronicle*, 260 Mont. at 220, 859 P.2d at 437. The Bozeman Daily Chronicle (Chronicle) sought the name of the officer and the investigative documents. *Bozeman Daily Chronicle*, 260 Mont. at 221, 859 P.2d at 437.

¶34 We upheld the District Court's order to release the name, and reversed its order shielding the investigative documents. *Bozeman Daily Chronicle*, 260 Mont. at 221, 229, 859 P.2d at 437, 442. Though the officer had been off duty at the time of the alleged misconduct, and had resigned by the time of the Chronicle's request, we noted that "the nature of the alleged misconduct ran directly counter to the police officer's sworn duty to uphold the law, to prevent crime, and to protect the public. . . . [S]uch alleged misconduct went directly to the police officer's breach of his position of public trust [and] therefore, this conduct is a proper matter for public scrutiny." *Bozeman Daily Chronicle*, 260 Mont. at 227, 859 P.2d at 440.

¶35 In *Jefferson County*, ¶¶ 4-5, the Montana Standard sought information regarding the arrest for DUI of Beaverhead County Commissioner Donna Sevalstad (Sevalstad).

Sevalstad pled guilty to driving under the influence of alcohol and driving with an expired license. *Jefferson Co.*, ¶ 4. We cited our decision in *Whitlock* in affirming the District Court's order to release the requested information. *Jefferson Co.*, ¶ 16. Because Sevalstad was an elected official, the public had the responsibility in hiring, supervising and disciplining her actions, which requires that the public be informed of her actions and conduct. *Jefferson Co.*, ¶¶ 16-17 (citing *Whitlock*, 255 Mont. at 522, 844 P.2d at 77). Even though her driving habits didn't pertain directly to her duties as County Commissioner, "her decision to violate the law directly relate[d] to her ability to effectively perform her job duties. That is, Sevalstad's decision to violate the law questions her judgment." *Jefferson Co.*, ¶ 17.

¶36 We have also held that teachers hold positions of public trust because they are entrusted with the care and instruction of children. *Svaldi v. Anaconda-Deer Lodge Co.*, 2005 MT 17, ¶ 31, 325 Mont. 365, 106 P.3d 548. Antoinette Svaldi (Svaldi), a teacher in the Anaconda public school system for approximately 25 years, was alleged by several parents to have assaulted or verbally abused their children. *Svaldi*, ¶ 5. Svaldi filed an action against the County alleging that her right to privacy was violated when the County Attorney informed a reporter from a local paper that his office was discussing a deferred prosecution agreement with Svaldi's attorney in exchange for Svaldi's promise to resign from teaching. *Svaldi*, ¶¶ 10-11. We affirmed the District Court's grant of summary judgment in favor of the County, even though no criminal charges were ultimately filed and no deferred prosecution agreement was ever entered, because she was in a position of

16

public trust and the allegations of assault against her students "went directly to her ability to properly carry out her duties." *Svaldi*, ¶ 31.

¶37 In *Yellowstone County v. Billings Gazette*, 2006 MT 218, ¶¶ 22-23, 333 Mont. 390, 143 P.3d 135, we held that an interim chief public defender did not have a reasonable expectation of privacy in his deposition testimony for an employment discrimination lawsuit that outweighed the public right to know. Following the resignation of the Yellowstone County Chief Public Defender, Curtis Bevolden (Bevolden) was hired as the interim chief. *Yellowstone Co.*, ¶ 4. Bevolden fired the Deputy Chief Defender, Roberta Drew (Drew), who had also applied for the interim chief position, but an internal grievance proceeding resulted in Drew's reinstatement. *Yellowstone Co.*, ¶ 4. Drew filed a federal discrimination suit against the County, Bevolden, and other officials. *Yellowstone Co.*, ¶ 4. The Gazette requested Bevolden's unredacted deposition transcript from the suit. *Yellowstone Co.*, ¶ 7.

¶38 In holding that the public right to know was not clearly outweighed by any privacy interest Bevolden may have in the redacted information, we noted that public defenders have the duty to safeguard the constitutional rights to counsel and a fair and speedy trial, and are essential to preserving public trust in our judicial system. *Yellowstone Co.*, ¶ 22. We also held that the redacted information of the transcript "bears directly on Bevolden's professional judgment, the management decisions he made as Interim Chief Public Defender, and his official conduct." *Yellowstone Co.*, ¶ 23. Because the information

17

being sought related directly to the official duties of a person in a position of public trust, Bevolden could not assert a right to privacy that outweighed the public's right to know.

¶39 In 2011, we decided *Billings Gazette v. Billings*, 2011 MT 293, 362 Mont. 522, 267 P.3d 11. Deanna Anthony (Anthony), a Police Department Senior Administrative Coordinator authorized to use a police department credit card, was investigated for allegations that she had made thousands of dollars of personal purchases using the card. *Billings Gazette*, ¶¶ 3, 25. Following the investigation, Anthony was issued a 16-page "due process letter" notifying her of a due process hearing to respond to the allegations against her, and detailing the evidence gathered during the investigation. *Billings Gazette*, ¶ 4. The City denied the Gazette's request for the letter. *Billings Gazette*, ¶ 5.

¶40 We held that even though she was an administrative employee, Anthony held a position of public trust because she was in a job that "allowed her to spend large amounts of public monies." *Billings Gazette*, ¶ 22. Because the information being sought related directly to an investigation for allegations of misappropriating public funds, "the very aspect of her job that render[ed] it a 'position of public trust,'" the due process letter was properly subject to public disclosure. *Billings Gazette*, ¶ 22. However, we also pointed out that not "every public employee with purchasing power can have no expectation of privacy in her personnel matters." *Billings Gazette*, ¶ 27. Based on the facts of the case ("the alleged embezzlement of large sums of [public] money over a protracted period of time"), we held that information relating to a public employee's violation of the public trust implicit in her duties should be released to the public. *Billings Gazette*, ¶ 27.

18

¶41 Having reviewed our prior cases, we turn to the case at bar. The information at issue in this case is limited to the identity of the Employees, including identifying information such as job title and department, as all other aspects of the misconduct, including the nature of the misconduct, the websites visited, the investigation process, and the discipline issued, has been disclosed to the Gazette. Initially, we note that the specific allegations of misconduct, accessing adult or pornographic websites, are not a focus of this analysis. We have held that a public employee is not entitled to heightened privacy protections simply because the information at issue was sexual in nature. *Harris v. Smartt*, 2002 MT 239, ¶ 66, 311 Mont. 507, 57 P.3d 58 (Justice of the Peace not entitled to heightened privacy rights in pornography downloaded to his county-owned computer). However, neither is a public employee given less of a privacy right due to the sexual nature of the information. The fact that the images viewed on the Employees' computers "had sexual content does not influence the privacy analysis." *Harris*, ¶ 67.

¶42 The City averred that the Employees were not elected officials, department heads, or high management. After *in-camera* review of the unredacted Corrective Action Forms, the District Court did not make any finding that any of the Employees hold any particular position of trust with regard to public spending or public safety. Our review of the unredacted forms does not convince us otherwise. Additionally, the Internet usage of the Employees was not related to their public duties. The Gazette has not argued to this Court that disclosure of the Employees' positions or titles, separate and distinct from the

19

Employees' names, was necessary in order to analyze their respective expectations of privacy.

¶43 Rather, the Gazette argues that there can be no reasonable expectation of privacy in the identity of any public employee if the employee was disciplined for misconduct. The Gazette argues that this holding follows from our decision in *Great Falls Tribune* where we stated: "it is not good public policy to recognize an expectation of privacy in protecting the identity of a law enforcement officer whose conduct is sufficiently reprehensible to merit discipline." *Great Falls Tribune*, 238 Mont. at 107, 775 P.2d at 1269. We reiterated this in *Bozeman Daily Chronicle*, 260 Mont. at 225, 859 P.2d at 439. However, there are key distinctions between those cases and this one.

¶44 First, in both prior cases the discipline was severe. *See Great Falls Tribune*, 238 Mont. at 104, 775 P.2d at 1267 (one officer was fired and two others were given the option to resign or be terminated); *Bozeman Daily Chronicle*, 260 Mont. at 220, 859 P.2d at 436-37 (officer resigned after it was recommended that he not be allowed to continue in law enforcement). Here the employees were given a five-day suspension without pay, a far cry from being discharged or forced to resign. If we were to give the statement from *Great Falls Tribune* the meaning urged by the Gazette, any disciplinary action, no matter how trivial, would trump an employee's right to privacy.

¶45 Other important distinctions in the case here are the positions held by the disciplined Employees and the relation of their positions to the alleged misconduct. In *Great Falls Tribune*, the employees whose identities were being sought were law

20

enforcement officers who had engaged in misconduct in the line of their official duties. We held that law enforcement officers hold a particular position of public trust due to their sworn duty to protect the public health, safety, and welfare. *Great Falls Tribune*, 238 Mont. at 107, 775 P.2d at 1269. Allegations of misconduct in apprehending a suspect and failing to seek medical attention for his injuries clearly violate this duty. Similarly, in *Bozeman Daily Chronicle*, we noted that allegations of criminal conduct, even while off duty, ran directly counter to the officer's duty to uphold the law and prevent crime. *Bozeman Daily Chronicle*, 260 Mont. at 227, 859 P.2d at 440. Also, the officer's position was implicated by the victim's status as a police cadet. No similar connection can be made with regard to the Employees in this case.

¶46 The Dissent argues that the Employees' actions could be considered illegal conduct under the Computer Fraud and Abuse Act, as well as Montana's Unlawful Computer Use, Theft, and Official Misconduct statutes. Dissent, ¶ 68. However, no criminal charges have been filed or are contemplated in this case. Notably, the Ninth U.S. Circuit Court of Appeals has held that an employee's misuse of an employer's computer is not a crime under the Computer Fraud and Abuse Act. *U.S. v. Nosal*, 676 F.3d 854, 860 (9th Cir. 2012) (refusing to read the CFAA as policing employer personnel policies through criminal law). In any event, the misconduct in this case does not rise to the level of illegal conduct that was present in *Great Falls Tribune*, *Bozeman Daily Chronicle*, or *Billings Gazette*.

21

¶47 Additionally, we have previously held that matters relating to employee misconduct can be protected from the public right to know. In *Montana Human Rights Division*, we held that public employees possess a privacy right in their personnel files. 199 Mont. at 443, 649 P.2d at 1288. The Court noted that personnel files can include sensitive information such as drug and alcohol problems, prison records, poor work performance, and tardiness—all forms of wrongful conduct. *Mont. Human Rights Div.*, 199 Mont at 442, 649 P.2d at 1288. "A discussion regarding an employee's alleged wrongful conduct constituted precisely the type of communication that frequently occurred between the employer and employee." *Billings Gazette*, ¶ 48 (Morris, Rice, Baker, JJ., dissenting) (citing *Mont. Human Rights Div.*, 199 Mont at 442, 649 P.2d at 1288). The Court in *Montana Human Rights Division* recognized the fact that there is frequently pressure upon an employee to "communicate these matters to his employer in the privacy of his boss's office . . . ." *Mont. Human Rights Div.*, 199 Mont at 442, 649 P.2d at 1288. Even without any assurance of confidentiality, the Court nevertheless concluded that "employees would reasonably expect such communication normally would be kept confidential." *Mont. Human Rights Div.*, 199 Mont at 442, 649 P.2d at 1288. Thus, an allegation of misconduct by a public employee does not summarily end the privacy analysis.

¶48 The Gazette also argues, and the District Court agreed, that the City's Acceptable Use Policy demonstrates that the public placed its trust in the Employees with respect to Internet usage. It further argues that misuse of the Internet, a City resource, while at

work is a violation of that public trust that relates directly to their fitness to perform a public duty. However, evident from the above discussion of our cases, not all public employees hold the same level of privacy in all disciplinary matters simply on the basis of having a public employer. We are not prepared to say that providing public employees with access to a computer on which to do their work itself "evinces a public trust" that can be breached by a violation of an Internet use policy. Nor are we prepared to hold that any violation of office policy by any government employee results in a violation of public trust simply because tax dollars pay that employee's salary. To do so would be tantamount to a holding that all citizens lose their constitutionally guaranteed right to privacy on the day they enter public employment. If university presidents do not automatically lose their constitutional protections by taking office, *Missoulian*, 207 Mont. at 526, 675 P.2d at 969, the same would certainly be true for the thousands of other public employees.

¶49 Our past cases have held, and we reaffirm today, that the "'right of privacy turns on the reasonableness of the expectation, which may vary, even regarding the same information and the same recipient of that information'. . . [T]ime, place and status are factors in the reasonableness determination." *Missoulian*, 207 Mont. at 523, 675 P.2d at 968 (quoting *Montana Human Rights Div.*, 199 Mont. at 443, 649 P.2d at 1288). Where the status of the employee necessitates a high level of public trust, such as an elected official or high level employee, the expectation of privacy in misconduct may be found to be significantly lower than for an administrative employee. Similarly, an employee may

23

have a lower expectation of privacy in misconduct related to a duty of public trust, such as responsibility for spending public money or educating children.

¶50     Here, the Employees are not elected officials, high-level management, or department heads, nor is there evidence that any specific duty alleged to have been violated related to the performance of a public trust function. The information being sought is merely their identities in relation to internal disciplinary action for a violation of office policy. We hold that society would be willing to accept as reasonable a public employee's expectation of privacy in his or her identity with respect to internal disciplinary matters when that employee is not in a position of public trust, and the misconduct resulting in the discipline was not a violation of a duty requiring a high level of public trust.

¶51     The Dissent employs a Fourth Amendment analysis and concludes that the Employees had no reasonable expectation of privacy in their computer misuse. Dissent, ¶¶ 74, 75. The Fourth Amendment protects persons from unreasonable searches and seizures in the criminal context. The misconduct in this case involved no criminal conduct. Further, the civil cases cited by the Dissent, including the extensive quote from *Muick v. Glenarye Electronics*, 280 F.3d 741 (7th Cir. 2002), involve employee privacy claims raised against employers who sought information. Rejection of such claims by the courts in these cases was appropriately premised upon the employees' lack of an expectation of privacy as to their employers. Unlike these cases, there is here no privacy claim by the Employees against the City. The City obtained the information from the

24

Employees' computers pursuant to the computer use policy, and proceeded to discipline the Employees. The question is whether the Gazette—a third party—is entitled to the identifying information about the Employees.

¶52 Montanans are provided a "heightened expectation of privacy" under the Montana Constitution in comparison to the U.S. Constitution, *State v. 1993 Chevrolet Pickup*, 2005 MT 180, ¶ 9, 328 Mont. 10, 116 P.3d 800, and Article II, Sections 9 and 10 of the Montana Constitution explicitly require that a balancing of the right to know and the right to privacy be conducted in this case. This Court's precedent provides the appropriate analysis of the particular state constitutional provisions that govern here, without regard to Fourth Amendment jurisprudence or federal approaches to the issue.

¶53 Having found that the Employees had an actual or subjective expectation of privacy that society is willing to find reasonable, we must balance the Employees' right to privacy against the merits of public disclosure.

### B. Balancing Privacy with the Public Right to Know

¶54 The City argues that the risks mentioned in *Missoulian* with respect to performance evaluations are present in this case and necessitate a need for confidentiality in internal disciplinary matters. Specifically, it asserts that it has an interest in the confidentiality of disciplinary measures in order to effectively address and react to misconduct without fear that employer criticisms and disciplinary actions will be publicly disseminated. It argues that honest and critical communications between employers and employees will suffer, and there could be a risk of vindictive use of the discipline

25

process, which lacks an opportunity for the employee to rebut the alleged misconduct, if disciplinary actions are subjected to public scrutiny.

¶55 The only argument offered by the Gazette in favor of public disclosure is that "[o]penness promotes fairness and thwarts cronyism." It argues that without knowing the name and status of each disciplined Employee, the public cannot determine why each Employee was given the same punishment, or why an employee of a different public agency was given a harsher punishment for similar conduct. The District Court agreed, holding that public disclosure of the corrective action forms and identifying information would "foster[ ] a public confidence in public institutions and maintain[ ] the accountability of public officers."

¶56 However, as we held in *Missoulian*, general assertions that public disclosure will foster public confidence in public institutions and maintain accountability for public officers are not sufficient to establish a strong public interest. *Missoulian*, 207 Mont. at 532, 675 P.2d at 972. The Gazette has already received information regarding the misconduct of the Employees, the investigation by the City, and the discipline meted out to each Employee. If the public is dissatisfied with the discipline chosen by the City, it has all the information it needs to voice its opinions and objections to the City Council, the Mayor, or the newspaper. Public knowledge of the names of the individuals disciplined will not provide the public with any greater opportunity to participate in the internal employment decisions of the City.

26

¶57 Unlike public officials, over whom the public has responsibilities regarding "hiring, disciplinary action, and supervision," *Whitlock*, 255 Mont. at 522, 844 P.2d at 77, it is the responsibility of the City to hire, fire, and discipline its employees. Such decisions necessarily involve a subjective determination on the part of the supervisor. The nature of the work to be done, the alleged misconduct, and the person making the disciplinary decision will all affect the type of discipline meted out, even for the exact same violation. As we noted in *Flesh*, these disciplinary decisions necessitate a review of the employee's entire personnel file. *Flesh*, 241 Mont. at 166, 786 P.2d at 9.

¶58 Finally, to hold that the general interests of "fairness and prevention of cronyism," absent any allegations that such has occurred, is sufficient to outweigh an employee's privacy interest would open all public employment decisions to public scrutiny. Decisions of whom to hire, promote, discipline, or terminate are all decisions that require a subjective evaluation by supervisors based upon past performance, personality, character, test scores, etc. Our past cases preclude such an expansive holding.

¶59 We conclude that the Employees' reasonable expectation of privacy in their identities with regards to internal disciplinary proceedings clearly outweighs the limited merits of public disclosure. "This information may make interesting or sensational news copy, but we conclude that public disclosure is not in the public interest." *Missoulian*, 207 Mont. at 532, 675 P.2d at 972.

¶60 *2. Did the District Court err by denying the Gazette's request for attorney fees and costs?*

¶61 Having concluded that the District Court's order to disclose the Employees' identities was entered in error, we decline to address the Gazette's request for attorney fees.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ BRIAN MORRIS

Justice Laurie McKinnon, dissenting.

¶62 In my view, a City employee has no reasonable expectation of privacy in viewing pornographic materials over the Internet using a City computer during work hours—particularly when there is a policy in place which specifically advises employees that use of the Internet is not anonymous and may be monitored. Moreover, placement of a final disciplinary report (the Corrective Action Form) into an employee's personnel file does not transform the employee's open and pervasive access to pornographic material over the Internet into a private activity. The Court, by misstating the question as "whether the Employees had an actual expectation of privacy in their identities in relation to *internal disciplinary proceedings*, not as to their employer's knowledge of the Internet usage," Opinion, ¶ 20 (emphasis added), redefines the inquiry in order to recognize a privacy

interest that other courts have uniformly held to be unreasonable.  After finding that the Employees were "not in a position of public trust" and that "the misconduct resulting in the discipline was not a violation of a duty requiring a high level of public trust," Opinion, ¶ 50, the Court concludes that the name, position, and department of a City employee accessing pornography may not be disclosed to the public.  In my view, it is not necessary to decide whether the Employees are in positions of "public trust," because the Employees do not have an expectation of privacy, which Montanans are willing to accept as reasonable, in the fact that they accessed, posted, and enjoyed pornographic material while working for a public employer with an Internet use policy.

¶63    All City employees are subject to the City's "Acceptable Use" policy, which applies to "all equipment, systems and tools used for electronic communication, local area networks, computer networks, the Internet and e-mail."  Among other things, the policy prohibits use of City computers to access or store "offensive graphical images."  It also prohibits "[u]sing any means to defeat security systems on any computer network" and the "propagation of computer worms and viruses."  Employees are advised that "[u]se of the Internet may be monitored by the City."  Moreover, the policy states:

> The City's Internet hosts are traceable to the City.  *Users using City-provided Internet accounts should not assume they are provided any degree of anonymity.  Outside users who want to identify machines associated with the City can do so easily.*  [Emphasis added.]

¶64    In the spring of 2012, the City conducted internal investigations into the Internet activity of five City employees on City-provided computers and ultimately issued written

29

Corrective Action Forms suspending each employee for five days without pay. The nature of the violations were set forth in the Corrective Action Forms as follows:

1. Daily logs of each of the five employees showed a pattern of "[s]eeking out pictures of women on the internet that were sexual in nature." These images included "nude adults," "pictures that were pornographic in nature," and "scantily clad adults that were inappropriate for the workplace."

2. Daily logs also showed a pattern of "[e]xcessive amounts of time being spent on non-work related searches while . . . being compensated to perform . . . assigned duties."

3. One of the employees had conducted "[s]earches on blog, foreign country and image hosting sites. Specifically, links were found to a Polish site with adult content that contained file sharing functionality, subsequently increasing the potential of a virus threat to the City's computer network."

4. Another employee had saved four images of "scantily clothed and nude adults and pictures that were pornographic in nature."

5. Yet another employee had sought out "pictures of women associated with escort services."

As noted, the City disciplined the Employees by imposing five days of suspension on each. Although the suspensions were without pay, the City did not dock any pay of the employees for the "excessive" amount of work time they had spent viewing pornography.

¶65 As the Court observes, the documents requested by the Gazette have already been disclosed. Opinion, ¶¶ 9, 17. However, certain information has been redacted from those documents—information that the Gazette contends the public has a constitutional right to know. Specifically, the information redacted in the Corrective Action Forms includes the employee's name, the employee's position, the employee's department, and the name of the employee's supervisor.

30

¶66 Despite this Court's knowledge—acquired through our in-camera review of the unredacted Corrective Action Forms—that some of the disciplined employees held upper-level positions and/or were involved in law enforcement, we refuse to apply that knowledge and analysis in resolving this case. We avoid the analysis by stating: "The City *averred* that the Employees were not elected officials, department heads, or high management." Opinion, ¶ 42 (emphasis added). But the Court *knows* what positions the Employees held because we, like the District Court, reviewed the documents, which are part of the record on appeal. We nevertheless ignore the Employees' positions in spite of our precedent and the Gazette's argument that the public has a constitutional right to assess whether the City meted out discipline fairly. We avoid an analysis that incorporates consideration of the Employees' specific positions by determining that the Gazette did not advance this argument (How could it, given that the Gazette was not privy to that information?) and that "the District Court did not make any finding that any of the Employees hold any particular position of trust with regard to public spending or public safety." Opinion, ¶ 42. In failing to recognize the significance of the redacted information to the Gazette's investigation, we have subjectively limited the Gazette's inquiry and decided the direction the Gazette's investigation and reporting should take. Montana's constitutional provision embracing the citizenry's right to know is premised on the right to have information disseminated and available so that *the public*—not this Court—may draw its own inferences and conclusions from the information and thereby make informed decisions regarding their governmental bodies. The unfiltered

31

dissemination of information is fundamental to the exercise of Montana's constitutional right to know and is limited only where an individual has a reasonable privacy interest that "clearly exceeds" the merits of public disclosure. Mont. Const. art. II, § 9.

¶67 Although the Court states that "[t]he only argument offered by the Gazette in favor of public disclosure is that '[o]penness promotes fairness and thwarts cronyism,' " Opinion, ¶ 55 (second brackets in original), the Gazette has actually advanced several arguments in support of its request for disclosure—arguments which the Court fails to acknowledge. First, the Gazette has argued that in violating the City's Acceptable Use policy, the Employees acted to defeat the security system on the City's computer network and potentially compromised the City's workplace by breaching security devices and introducing viruses from international pornography websites. While the Court states that "the specific allegations of misconduct, accessing adult or pornographic websites, are not a focus of this analysis," Opinion, ¶ 41, the Gazette argues that the pornographic nature of the material and the potential for security breaches are relevant in determining what society recognizes as a reasonable expectation of privacy. We are required to examine the privacy interest " 'in the context of the facts of each case.' " *Associated Press, Inc. v. Mont. Dept. of Revenue*, 2000 MT 160, ¶ 24, 300 Mont. 233, 4 P.3d 5 (emphasis omitted) (quoting *Missoulian v. Bd. of Regents of Higher Educ.*, 207 Mont. 513, 529, 675 P.2d 962, 971 (1984)). Accordingly, we cannot avoid examining the content of the material at issue and the security threats posed by the individuals' actions when assessing whether society would recognize the privacy interest as reasonable. I thus do not agree that "[t]he

32

fact that the images viewed on the Employees' computers 'had sexual content does not influence the primary analysis.' " Opinion, ¶ 41. I seriously question whether society is willing to protect the privacy of a public employee who breaches security devices, thus exposing the City's computer network to damage from viruses and other malware, in order to view pornography on a public computer during work hours. The pornographic nature of the material is important, in the context of all other factors.

¶68 Second, the Gazette maintains that the public has an interest in knowing whether public employees are violating the law. The Gazette argues that although no charges have been filed, the Employee's conduct can be characterized as illegal under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Gazette points to several court decisions which have held that violating the terms of an "acceptable use" policy may constitute a federal offense. *See e.g. U.S. v. John*, 597 F.3d 263, 271-73 (5th Cir. 2010); *U.S. v. Rodriguez*, 628 F.3d 1258, 1263 (11th Cir. 2010); *cf. U.S. v. Teague*, 646 F.3d 1119, 1122 (8th Cir. 2011). Significantly, Montana has its own criminal offenses relating to the unlawful use of a computer. Section 45-6-311(1)(a), MCA, prohibits a person from knowingly or purposely "obtain[ing] the use of any computer, computer system, or computer network without consent of the owner." The City's Acceptable Use policy clearly establishes that employees are not authorized to use City computers to access pornographic materials over the Internet. Arguably, Montana's theft statute is likewise implicated by the Employees' conduct. Pursuant to § 45-6-301(2)(a), MCA, a person commits the offense of theft when the person purposely or knowingly obtains, by

33

deception, control over another's property (money paid in the form of wages) with the purpose of depriving the owner (the City) of that property. Montana additionally has an "official misconduct" statute that makes it unlawful for a "public servant" to "knowingly perform[ ] an act in an official capacity that the public servant knows is forbidden by law." Section 45-7-401(1)(b), MCA. "Public servant" means "an officer or *employee of government*." Section 45-2-101(64)(a), MCA (emphasis added). This Court's precedent establishes that the public has the right to know about unlawful activity of public employees. *Great Falls Tribune Co. v. Cascade Co. Sheriff*, 238 Mont. 103, 107, 775 P.2d 1267, 1269 (1989); *Bozeman Daily Chron. v. City of Bozeman Police Dept.*, 260 Mont. 218, 227, 859 P.2d 435, 440-41 (1993). Furthermore, our constitutional right to know protects the right to receive information about decisions of government officials to prosecute or commence a criminal investigation. The fact that "no criminal charges have been filed or are contemplated," Opinion, ¶ 46, puts the cart before the horse—this is precisely the information the public has the right to know in order to evaluate the conduct of public officials.

¶69 Third, the Gazette also maintains that the public has the right to scrutinize whether the discipline the City imposed on the Employees was fair. While the Court seemingly finds it significant that the punishment meted out in other cases was "severe" while the punishment meted out in the present case was less so, Opinion, ¶ 44, I believe such an assessment of government discipline is best left for citizens to determine after being presented with adequate information. The Gazette specifically argued before the District

34

Court that during the same timeframe when the Employees here were given five-day suspensions, five employees with the City landfill also received five-day suspensions for taking trash outside the City during off-work hours. The Gazette maintained that the public has a right to scrutinize the discipline imposed and to question whether there is "some distinction between high-level employees" who got the same punishment "as the people in the landfill." Likewise, on appeal, the Gazette again questions whether "the status of the employees" accounts for the punishments that the City imposed—information which the Gazette maintains the public has a constitutional right to know.

¶70 Lastly, the Gazette argues that a substantial amount of taxpayer money was wasted on time the Employees spent accessing pornographic materials and that the investigation likewise has cost taxpayers money and public resources. The Gazette maintains that the public has an interest in how their government spends public funds, just as the public had a right to know the identity of the police department employee who misappropriated public funds in *Billings Gazette v. City of Billings*, 2011 MT 293, ¶¶ 22-27, 362 Mont. 522, 267 P.3d 11.

¶71 In light of the foregoing, the Gazette's arguments for public disclosure cannot be dismissed as merely seeking to promote fairness and thwart cronyism. Opinion, ¶ 51. Rather, in my opinion, the Gazette has set forth these particular arguments as components of a more general argument that disclosure fosters public confidence in public institutions and maintains accountability of public officers.

¶72 Determining whether public documents must be disclosed requires a balancing of the public's right to know with any competing privacy interests.[1] Mont. Const. art. II, §§ 9, 10. Again, the balancing must be done in the context of the facts of each case. *Yellowstone Co. v. Billings Gazette*, 2006 MT 218, ¶ 20, 333 Mont. 390, 143 P.3d 135. A person has a constitutionally protected privacy interest when (1) the person has an actual or subjective expectation of privacy and (2) society is willing to recognize that privacy expectation as reasonable. *Yellowstone Co.*, ¶ 20 (citing *Lincoln Co. Commn. v. Nixon*, 1998 MT 298, ¶ 16, 292 Mont. 42, 968 P.2d 1141).

¶73 In this case, the District Court observed that neither party had disputed the first prong of the test—actual or subjective expectation of privacy—and the District Court thus found that "the Employees did expect the fact they were disciplined for having misused public computers and the specifics regarding that misuse would be and remain private." The District Court further determined, however, that the Employees' subjective expectations of privacy were unreasonable in light of their knowledge that the City had the right to monitor their Internet usage and that they had no anonymity with respect to

---

[1] The Court declines to address the threshold issue of whether the documents requested by the Gazette are public documents for purposes of Article II, Section 9, "because all of the requested documents have already been disclosed" and "any further discussion as to whether these forms are considered public documents has been rendered moot." Opinion, ¶ 17. The entire contents of the requested documents have not been disclosed, however. Moreover, under our caselaw, our analysis requires a three-step process that includes consideration of whether the documents are public. *Becky v. Butte-Silver Bow Sch. Dist.*, 274 Mont. 131, 136, 906 P.2d 193, 196 (1995). Finally, the City has raised and argued the question whether the documents are public. For all of these reasons, I believe we are obliged to address the issue. Doing so, I would hold that the Corrective Action Forms are the result of an investigation conducted by a public employer and are public documents within the meaning of Article II, Section 9, pursuant to *Great Falls Tribune*, 238 Mont. at 107, 775 P.2d at 1269-70; *Becky*, 274 Mont. at 138, 906 P.2d at 197; and *Billings Gazette*, 2011 MT 293, ¶ 29.

the sites they visited. In my judgment, the District Court's conclusion was not only correct, but also consistent with that of numerous courts which have considered a public employee's expectation of privacy and decided that an Internet use policy negates any such expectation.

¶74    In *U.S. v. Angevine*, 281 F.3d 1130 (10th Cir. 2002), a university professor did not have a reasonable expectation of privacy in the contents of his computer given that the university had a computer policy explaining appropriate computer use and stating that usage could be monitored. The defendant could not have a reasonable expectation of privacy because reasonable university computer users should have been aware that network administrators and others were free to view data downloaded from the Internet. *Angevine*, 281 F.3d at 1134. In *U.S. v. Simons*, 206 F.3d 392 (4th Cir. 2000), government employees did not have a reasonable expectation of privacy in the information stored on their computers where a policy stated that the employer could audit, inspect, and/or monitor employees' use of the Internet. "This policy placed employees on notice that they could not reasonably expect that their Internet activity would be private." *Simons*, 206 F.3d at 398. In *Muick v. Glenayre Elecs.*, 280 F.3d 741 (7th Cir. 2002), an employee did not have a reasonable expectation of privacy in a laptop provided by his employer where the employer had notified the employee that it could inspect the laptop. The rationale set forth in the court's opinion is useful:

> Muick had no right of privacy in the computer that Glenayre had lent him
> for use in the workplace. Not that there can't be a right of privacy . . . in
> employer-owned equipment furnished to an employee for use in his place
> of employment. If the employer equips the employee's office with a safe or

file cabinet or other receptacle in which to keep his private papers, he can assume that the contents of the safe are private. But Glenayre had announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy that Muick might have had . . . . The laptops were Glenayre's property and it could attach whatever conditions to their use it wanted to. They didn't have to be reasonable conditions; but the abuse of access to workplace computers is so common (workers being prone to use them as media of gossip, titillation, and other entertainment and distraction) that reserving a right of inspection is so far from being unreasonable that the failure to do so might well be thought irresponsible.

*Muick*, 280 F.3d at 743 (citations omitted).

¶75 Additional authority finding that a public employer's computer policy precludes a reasonable expectation of privacy includes *Wasson v. Sonoma Co. Junior College Dist.*, 4 F. Supp. 2d 893, 905-06 (N.D. Cal. 1997) (policy giving employer right to access all information stored on employees' computers extinguished any reasonable expectation of privacy in files stored on the computers); *Bohach v. City of Reno*, 932 F. Supp. 1232, 1234-35 (D. Nev. 1996) (police officers did not have a reasonable expectation of privacy in their use of a pager system because the police chief had issued an order notifying all users that their messages would be logged); *U.S. v. Hamilton*, 778 F. Supp. 2d 651, 653-54 (E.D. Va. 2011) (public school employee lacked a reasonable expectation of privacy in emails that were stored on his work computer because the computer use policy stated that the contents of the computer were subject to inspection); *cf. Am. Postal Workers Union v. U.S. Postal Serv.*, 871 F.2d 556, 560 (6th Cir. 1989) (postal employees had no reasonable expectation of privacy in their lockers because postal regulations and

collective bargaining agreements both stated that the lockers were subject to examination and inspection at any time).

¶76 Although the above-cited authority is largely in the context of Fourth Amendment jurisprudence, the reasonableness of an expectation of privacy—that is, what society will recognize as legitimate—does not vary depending upon whether the argument is made under the Fourth Amendment or under Montana's constitutional provision regarding an individual's right of privacy.[2] Our precedent recognizes the validity of federal caselaw in the context of a right-to-know analysis, regarding whether a privacy interest is one that society is willing to recognize as reasonable. In *Mont. Human Rights Div. v. City of Billings*, 199 Mont. 434, 442-43, 649 P.2d 1283, 1287-88 (1982), we applied the standard set forth by the Supreme Court in *Katz v. U.S.*, 389 U.S. 347, 88 S. Ct. 507 (1967), to evaluate what constituted a reasonable expectation of privacy in relation to the right to know. *Katz* was the landmark case that defined a constitutionally protected expectation of privacy, under the Fourth Amendment, as consisting of a subjective component and a reasonableness component. This Court has applied that test in search-and-seizure cases, *see e.g. State v. Hill*, 2004 MT 184, ¶ 24, 322 Mont. 165, 94 P.3d 752; *State v. Allen*, 2010 MT 214, ¶ 47, 357 Mont. 495, 241 P.3d 1045, in right-to-know cases, *see e.g. Mont. Human Rights Div.*, 199 Mont. at 442-43, 649 P.2d at 1287-88; *Great Falls Tribune*, 238 Mont. at 105, 775 P.2d at 1268; *Billings Gazette*, 2011 MT 293, ¶ 12, and in pure privacy

---

[2] It is well established that Montana's Constitution affords individuals broader protection of privacy than does the federal constitution. *Gryczan v. State*, 283 Mont. 433, 448-49, 942 P.2d 112, 121-22 (1997); *State v. Malkuch*, 2007 MT 60, ¶ 12, 336 Mont. 219, 154 P.3d 558.

cases, *see e.g. Hastetter v. Behan*, 196 Mont. 280, 282-83, 639 P.2d 510, 512-13 (1982); *State v. Nelson*, 283 Mont. 231, 239-42, 941 P.2d 441, 446-48 (1997); *Gryczan*, 283 Mont. at 449-50, 942 P.2d at 122.

¶77 I cannot accept that Montana citizens would recognize as reasonable, under *Katz*, *Mont. Human Rights Div.*, or any other precedent, this Court's willingness to shield the identities, positions, departments, and supervisors of public employees who access pornographic material on their work computers during work hours after having been warned that their computer usage would be monitored and that they cannot expect anonymity. I also am not willing to carve out an exception to the well-established test for determining a constitutionally protected expectation of privacy because we want to protect particular employees from embarrassment. The reasonableness of an expectation of privacy depends on what *society* deems is legitimate, and such a test cannot logically depend on whether a claim is asserted pursuant to search-and-seizure jurisprudence or precedent interpreting the right to know.

¶78 Contrary to the Court's reasoning, *see* Opinion, ¶ 47, the City's placement of the final disciplinary report in each Employee's personnel file does not give the document protections that it otherwise would not have. The Employee's privacy expectation has been extinguished by the Acceptable Use policy and is not resurrected by placing the Corrective Action Form into a personnel file. Actions of the Employees in choosing to access websites at work on a City computer with an Internet use policy in effect, for which there was no reasonable expectation of privacy, cannot subsequently be made

private through actions of the City in placing the disciplinary report into the protective confines of the Employees' personnel files. To allow a public employer to potentially subvert the right to know by concealing the contents of the objectionable material in a personnel file would undermine the public's ability to evaluate the functioning of government and whether it is meting out discipline fairly and evenhandedly.

¶79 The rationale for protecting from disclosure the contents of a personnel file does not exist in this case. Arguably, the Corrective Action Form is more akin to the "due process letter" in *Billings Gazette*, 2011 MT 293, which we noted was different from the job performance evaluations of university presidents in *Missoulian*, 207 Mont. 513, 675 P.2d 962, and the employment applications in *Mont. Human Rights Div.*, 199 Mont. 434, 649 P.2d 1283. As we stated in *Mont. Human Rights Div.*, 199 Mont. at 442, 649 P.2d at 1287-88:

> Employment records would reasonably contain, among less sensitive information, references to family problems, health problems, past and present employers' criticism and observations, military records, scores from IQ tests and performance tests, prison records, drug or alcohol problems, and other matters, many of which most individuals would not willingly disclose publicly. Some testing and disclosure (e.g., past employment records, prison records, drug or alcohol use) is a necessary part of many applications for employment; other information may be compiled by present employers or may be submitted by an employee in explanation of absence from work or poor performance on the job. It is clear that there is frequently pressure upon an employee to communicate these matters to his employer in the privacy of his boss's office or on an application for employment or promotion. And while, as far as we know, respondents gave their employees no specific assurances of confidentiality, we believe that employees would reasonably expect such communication normally would be kept confidential.

41

¶80    Significant to our decision in *Missoulian* was a written policy that provided for confidentiality of self-evaluations.  We noted that

> the Board's written evaluation policy stated that the self-evaluations would be confidential and the evaluation meetings would be conducted in "executive session."  The anonymous interviewees who commented on the presidents' performance were promised confidentiality.  It is undisputed that the six university presidents actually expected that the job performance evaluations would be private.  [They] submitted their self-evaluations expecting confidentiality.

*Missoulian*, 207 Mont. at 523, 675 P.2d at 968.  We held that these expectations of privacy were reasonable.  *Missoulian*, 207 Mont. at 527, 675 P.2d at 970.

¶81    In contrast, the Acceptable Use policy here specifically advises that there is no confidentiality in the materials and the activities conducted on an employee's computer.  Furthermore, nothing in the Corrective Action Form contains sensitive information akin to an employment record, such as family references, health problems, prison records, or drug and alcohol issues.  The Corrective Action Form is the final report of the discipline a public employer has imposed on its employee.  The Gazette is not requesting the Employees' entire personnel files, employment records, or performance evaluations; it is requesting the final report—the end product—of the City's investigation into misconduct of its employees.

¶82    "Government offices are provided to employees for the sole purpose of facilitating the work of an agency.  The employee may avoid exposing personal belongings at work by simply leaving them at home."  *O'Connor v. Ortega*, 480 U.S. 709, 725, 107 S. Ct. 1492, 1501-02 (1987) (plurality).  Likewise, a public employee who is paid by taxpayers

does not have a reasonable expectation of privacy in viewing pornography during work hours on a City computer, particularly when he/she has been advised by the City that computer use is not anonymous.

¶83     The District Court concluded that because "the Employees' privacy expectations were unreasonable under these circumstances, their privacy rights do not clearly exceed the merits of public disclosure." Mont. Const. art. II, § 9. I agree with this conclusion. Although public humiliation may be an unfortunate consequence of disclosure, it is not a defense to disclosure. To the extent the Court holds otherwise, I strongly disagree.


                                        /S/ LAURIE McKINNON


Justice Patricia O. Cotter joins the Dissent of Justice Laurie McKinnon.

                                        /S/ PATRICIA COTTER